Pietro PARRAVANO, et al., Plaintiffs,

v.

Bruce BABBITT, as Secretary of the United States Dep't of the Interior, et al., Defendants.

No. C93–2003 TEH.

United States District Court, N.D. California.

Nov. 3, 1993.

James M. Johnson, Olympia, WA, Mary L. Hudson, Gorman & Waltner, Oakland, CA, for plaintiffs.

James C. Kilbourne, Jean E. Williams, U.S. Dept. of Justice, Environment and Natural Resource Div., Washington, DC, for defendants.

## ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on Tuesday, August 10, 1993 on the parties' Cross–Motions for Partial Summary Judgment and defendants' Motion to Strike Plaintiffs' Affidavits and Limit Review to the Administrative Record. Having carefully considered the parties' written and oral arguments, and the record herein, the Court grants defendants' motion to strike, and grants in part, and denies in part, the cross-motions for summary judgment as set forth below.[1]

### I.

### OVERVIEW

The focal point of this action is the popular Klamath River fall chinook. These salmon spawn in the Klamath River and its upper tributaries, migrate downstream to the ocean, and then return to their fresh water origins at age three or four to spawn and then die. An unfortunate combination of overfishing, prolonged drought, and habitat degradation, have led to significantly depressed levels of Klamath chinook stock, to the detriment of commercial fishing interests, sport fishermen, and the Native American tribes who rely on these fish for subsis-

---

1. In order to accommodate the parties' desire for a prompt ruling, the Court issued a summary ruling on August 12, 1993, and stated that it would issue an opinion setting forth a fuller account of its reasoning at a later date. We now issue the fuller opinion referred to in our August 12, 1993 order.

tence and ceremonial needs. *See, United States v. Eberhardt,* 789 F.2d 1354, 1363 (9th Cir.1986) (conc. opin.) (overfishing has depleted the stocks of Klamath River fish). The conflicts inherent in having a chinook population too small to satisfy the needs of all who have a stake in the Klamath salmon are what underlie this case.

Plaintiffs are commercial fishermen and commercial fishing associations[2] who contend that the Secretary of Commerce ("The Secretary") improperly reduced, by way of an invalid emergency regulation, the Klamath chinook ocean harvest rate for the fall fishing season, which opened May 1, 1993. They contend that the Secretary's actions violate the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et seq., the Administrative Procedure Act, 5 U.S.C. § 551 et seq., the "Sunshine Act," 5 U.S.C. §§ 552b, and the Pacific Fishery Management Plan. They seek a partial summary judgment (a) overturning that portion of the emergency regulation addressing the Klamath chinook, and (b) ordering enforcement of a higher ocean harvest rate recommended by the Pacific Fishery Management Council.

The Secretary cross-moves for a partial summary judgment affirming the validity of his emergency action.[3] The Secretary also moves to strike several declarations that plaintiffs filed in support of their motion for partial summary judgment. We first address the Motion to Strike, since it will inform the scope of our review on the cross-motions for partial summary judgment.

## II.

### DEFENDANTS' MOTION TO STRIKE

■ In support of their Motion for Partial Summary Judgment, plaintiffs have filed several affidavits from ocean commercial fishermen, the California Department of Fish and Game, the Oregon Department of Fish and Wildlife, and a member of the staff of the Pacific Fishery Management Council. The Secretary argues that because his actions may only be reviewed in light of the administrative record, consideration of the these extra-record affidavits is improper.

■ As plaintiffs concede, the general rule is that judicial review of the Secretary's actions under the Magnuson Act is confined to the administrative record. *Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1441 (9th Cir.1990); *Asarco, Inc. v. U.S. E.P.A.,* 616 F.2d 1153, 1160 (9th Cir.1980). There are, however, exceptions to this general rule. Specifically, supplementation of the record is appropriate where (1) there is "such a failure to explain administrative action as to frustrate effective judicial review," (2) the agency has relied on documents not included in the record, (3) extra-record evidence is necessary to clarify or explain technical terms, and (4) there is a showing of agency bad faith. *Public Power Council v. Johnson,* 674 F.2d 791, 793–95 (9th Cir.1982). It is the plaintiffs' burden to demonstrate that one or more of these exceptions apply. *See, Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436–38 (9th Cir.1988), *modified,* 867 F.2d 1244 (9th Cir.1989).

■ Plaintiffs' primary argument is that supplementation is needed because there is "such a failure to explain administrative action as to frustrate effective judicial review." This exception is limited to cases where the agency action is so poorly explained that effective review is precluded. Courts are "reluctant to invoke" this exception; furthermore, "[w]hen there is a need to supplement the record to explain agency action, the preferred procedure is to remand to the agency for its amplification." *Public Power Council,* 674 F.2d at 794; *State of Maine v. Kreps,* 563 F.2d 1052, 1054 (1st Cir.1977) (action remanded for Secretary to explain basis for her decision).

---

2. In addition to seven individual plaintiffs, there are five organizational plaintiffs: Pacific Coast Federation of Fishermen's Associations, Humboldt Fishermen's Marketing Association, Caito Fisheries, Inc., Golden Gate Fishermen's Association, and the Salmon Trollers Marketing Association.

3. By agreement between the parties, the cross-motions for partial summary judgment are limited to issues that do not require litigation of the rights of the Hoopa Valley and Yurok tribes to fish for the Klamath river chinook.

Even assuming that the Secretary's decision required amplification, the affidavits at issue would not address this deficiency. They do not illuminate the reasons for the Secretary's actions, but rather represent the views of persons opposed to the Secretary's action. Accordingly, they are not a proper basis for supplementing the record under the first *Public Power Council* exception.

■ Plaintiffs also insinuate that the Secretary has acted in "bad faith" by intentionally omitting two "comment letters." The Secretary states that the letters were forwarded to the regional office late, resulting in their unintentional omission. They have now been added to the record. We find nothing to support the suggestion of wrongdoing or bad faith in the omission of the two letters.

■ Plaintiffs also suggest that we should treat this case differently because it involves a challenge to an emergency regulation. However, they provide no support for this proposition, and we find no indication in the caselaw that the emergency nature of the regulation affects the traditional rules governing judicial review.[4]

Plaintiffs have failed to demonstrate that their proffered affidavits fall within any of the exceptions delineated by the court in *Public Power Council, supra.* Accordingly, defendants' Motion to Strike shall be granted.

### III.

### CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

*Background*

The Klamath chinook fall under the jurisdiction of three separate government entities. The United States Department of the Interi-

or has jurisdiction over the setting of salmon harvest levels for the Yurok and Hoopa Valley tribes who fish in the Klamath Trinity rivers which flow through their respective reservations. *See Pacific Coast Fed. v. Secretary of Commerce,* 494 F.Supp. 626, 631–633 (N.D.Cal.1980). The United States Department of Commerce has jurisdiction, under the Magnuson Act, to set harvest levels in the ocean between three and two hundred nautical miles offshore, referred to as the "exclusive economic zone" or "EEZ." 16 U.S.C. § 1801 et seq. Finally, the coastal states have jurisdiction over the area between the coast and three nautical miles offshore.[5]

Plaintiffs' challenge to the Secretary's actions rests primarily on the Magnuson Act. Enacted in 1976, the Magnuson Act was intended to respond to overfishing and inadequate conservation measures which were threatening future commercial and recreational fishing, as well as the very survival of species. 16 U.S.C. § 1801(a); *Lovgren v. Byrne,* 787 F.2d 857, 861 (3rd. Cir.1986) (Magnuson Act "was enacted at a time when overfishing of coastal waters was commonplace, threatening the existence of a number of species of fish"); *Pacific Coast Fed.,* 494 F.Supp. at 635, n. 7 ("over-fishing of species was a primary impetus to passage of the Act").

The Act provides for the establishment of regional Councils which are charged with developing, after public comment, a recommended fishery management plan ("FMP") for regulating fishing in the EEZ. 16 U.S.C. § 1852. The Councils also recommend seasonal adjustments and amendments to the FMP. *Id.* The Council's recommendations are submitted to the Secretary of Commerce who reviews them for consistency with seven "National Standards" set forth in the Act and

---

**4.** Plaintiffs also argue that the Motion to Strike is untimely because plaintiffs' declarations were filed along with an earlier Motion for an Order Shortening Time to hear plaintiffs' motion for partial summary judgment. Therefore, plaintiffs argue, defendants waived their right to bring this motion by not objecting to the affidavits during the "scheduling conference/hearing on Motion to Shorten Time." We disagree. First, defendants' counsel did object at the scheduling conference (her first opportunity to do so), and indicated she

would be filing a motion to strike. More importantly, filing declarations in support of a request to shorten time clearly does not preclude a challenge to their consideration in connection with a completely separate motion for summary judgment.

**5.** The state of California also has jurisdiction over recreational, in-river "sport harvest levels." *See* Administrative Record ("AR") at 84.

"other applicable law." Based on this review, the Secretary may either approve or disapprove the Council's recommendations. 16 U.S.C. § 1854; *Eberhardt,* 789 F.2d 1354 at 1363 (Councils "recommend" ocean fishing regulations to the Department of Commerce). The Act also authorizes the Secretary to bypass the above process and promulgate 90–day emergency regulations (which may be extended an additional 90 days), if "the Secretary finds that an emergency exists involving any fishery." 16 U.S.C. § 1855(c)(1).

The EEZ off the coast of Washington, Oregon, and California falls under the purview of the Pacific Fishery Management Council ("the Council"). In 1984, the Council recommended, and the Secretary adopted, a multi-year management plan for ocean salmon fishery, referred to as "the Final Framework Plan." *See* 50 C.F.R. § 661 (1992). Amendment Nine to the Framework Plan (adopted in 1988) provides for a spawning escapement [6] "rate" for Klamath river chinook of 35 percent of the potential adults from each brood, **but no fewer than 35,000 naturally spawning adults in any one year.** *See* 50 C.F.R. 661, Appendix at IV.A (1992) (emph. added); AR 4 at 12. This latter, 35,000 spawning escapement "floor," represents the *minimum* escapement believed necessary to avoid long-term decline of the Klamath Chinook, and can only be modified by formal amendment to the Framework Plan or by emergency regulation. *Id.* Appendix at IV.A., n. 3; 16 U.S.C. § 1854(c).

The Framework Plan recognizes that "Indians [7] residing on the Klamath River have a right to fish for salmon for subsistence and ceremonial purposes." AR 3 at 44; AR 121; *see also, Eberhardt,* 789 F.2d at 1363 (conc. opin.) ("The right to take fish from the Klamath River was reserved to the Indians when the Hoopa Valley Reservation was cre-

ated"). Thus, the Plan requires that the Council, in assessing the optimum yield to be achieved from the Fishery, account for the "requirements of the Indian fishery for salmon on the Klamath River." AR 3 at 9, § 3.3; *see also,* AR 3 at 11, Table 3–2. Finally, we note that the Magnuson Act requires that any management measure be consistent "with … and any other applicable law," 16 U.S.C. § 1854(a)(1)(B), which we construe as including United States obligations to Indian reservations with respect to fishing rights.

After holding public hearings, and reviewing analysis by the "Salmon Technical Team," the Council submitted a recommendation to the Secretary of Commerce on April 14, 1993, which, *inter alia,* recommended for the upcoming season a 22 percent ocean harvest rate for Klamath chinook (a substantial increase over the 1992 rate), and a spawning escapement floor of 35,000.

The instant dispute arose when the Secretary rejected the Council's recommendations regarding the Klamath chinook on the ground that they would lead to overfishing and further deterioration of chinook stock. The Secretary subsequently issued an emergency regulation that increased the 35,000 spawning escapement floor to 38,000, and decreased the ocean harvest rate to 14.5 percent.[8] Plaintiffs strenuously oppose the Secretary's actions on a number of procedural and substantive grounds.

*Standard of Review*

Actions taken by the Secretary of Commerce under the Magnuson Act are subject to limited judicial review. 16 U.S.C. § 1855(b). Specifically, Congress provided that courts may only invalidate a challenged regulation if the regulation is (1) arbitrary and capricious or an abuse of discretion, (2) unconstitutional, (3) in excess of statutory jurisdiction, or (4) was promulgated without

---

**6.** Spawning escapement refers to the amount of fish which must be allowed to escape harvest in both the ocean and the river so that they may return to their places of origin to spawn.

**7.** The Court's inclination is to use the term "Native American" instead of "Indian." However, the parties and the Administrative Record consistently refer to the members of the Yurok and Hoopa Valley Tribes as "Indians." In the inter-

ests of consistency, the Court will utilize the term "Indians" in the remainder of this Order.

**8.** The emergency regulation also incorporated the Council's other recommendations for the 1993 season that did not concern the Klamath River chinook. AR 12 at 26923; AR 13 at 31664.

observance of procedure required by law. *Id.;* 5 U.S.C. § 706(2).

■ The Ninth Circuit has emphasized the limited nature of review, stating that "[w]e must uphold the Secretary's regulations unless they are arbitrary and capricious." *Northwest Environmental Defense Center v. Brennan,* 958 F.2d 930, 934 (9th Cir.1992); *See also, State of Maine,* 563 F.2d at 1055 (courts may only determine whether Secretary's discretionary action under the Magnuson Act was "exercised rationally and consistently with the standards set by Congress and may not substitute its own judgment ... for that of the Secretary"). This limited review applies to review of emergency regulations as well. *Pacific Coast Fed.,* 494 F.Supp. at 633 ("The only question is whether the Secretary has made a reasonable finding that an emergency involving the salmon fishery resource exists").

*Discussion*

Plaintiffs seek to overturn the Secretary's actions on the ground that issuance of the emergency regulation was (a) arbitrary and capricious, and (b) done without observance of procedure required by law. 16 U.S.C. § 1855(b); 5 U.S.C. § 706(2)(A), (D). With respect to the former, plaintiffs contend that issuance of the emergency regulation was arbitrary and capricious because (1) the Secretary was obliged to approve and implement the Council's recommendations because they were consistent with the National Standards in the Magnuson Act, (2) the regulation violates three of the National Standards under the Magnuson Act, and (3) there was no reasonable basis for finding the existence of an emergency.

With respect to the latter, procedural challenges, plaintiffs contend that the Secretary's issuance of the emergency regulation was "not done in observance of procedure required by law" because (1) the Secretary failed to comply with procedures in the Administrative Procedure Act, (2) the Secretary failed to comply with procedures for changing the escapement floor set forth in the Fishery Management Plan, and, (3) the Sec-

retary's meetings with the Secretary of the Interior violated the "Sunshine Act."

Each of these claims is discussed in turn.

## ARBITRARY AND CAPRICIOUS ARGUMENTS

(1) Whether the Secretary was Obliged to Approve and Implement the Council's Recommendations because they were consistent with the National Standards in the Magnuson Act.

■ This claim raises the issue whether the Secretary acted arbitrarily in rejecting the Council's recommendations. In order to resolve this issue, some additional background regarding the Council's recommendation process and the Secretary's reasons for rejecting the Klamath chinook recommendations is required.

The 1993 ocean management process began in March of 1993, with an initial round of meetings and preparation of reports, including the Salmon Technical Team's analysis of the 1992 season. This report found, among other things, that the spawning escapement of Klamath chinook adults had fallen *below one-third* of the 35,000 minimum floor believed necessary to avoid long-term declines, for the last three years (1990–1992). The 11,100 escapement for 1992 was the lowest on record. AR 25; AR 12.[9]

During the process for accepting public input, The Secretary of the Department of the Interior submitted a letter in his capacity as trustee of the Hoopa Valley and Yurok tribes' federally reserved fishing rights. The letter noted that, while the precise share that the Indians were entitled to had not yet been legally quantified, it was his position that, as a reasonable and prudent trustee, he "must ensure" that at least 50 percent of the total allowable annual harvest be set aside for the "in-river" Indian fishery. AR 121. He further noted that because stock abundance had been extremely low in recent years, the Bureau of Indian Affairs had frequently curtailed Indian fishing to accommodate ocean

---

9. The escapement was 15,500 in 1990, 11,500 in 1991, and 11,100 in 1992. AR 7 at B–4 and II–4.

fisheries, "causing the tribes to bear a large share of the conservation burden." *Id.*[10]

The Council ultimately developed three options which were subsequently narrowed to two, both of which provided a spawning escapement floor of 35,000. One option provided for a 15 percent ocean harvest rate, which assumed a 50 percent Indian in-river harvest rate; the other provided for a 22 percent ocean harvest rate, which assumed a 32.5 percent Indian in-river harvest rate.

During a further public comment period, a representative of the Interior Department reiterated that it was the Interior Department's clear intent to provide affected tribes with 50 percent of the harvestable fish. AR 251 at S-6. The Hoopa Valley and Yurok Tribe representatives also stated their opposition to any option that did not allow for a 50 percent in-river Indian harvest. AR 251 at S-12 to S-14. In the end, the Council recommended the second option which provided for a 22 percent ocean harvest, a 32.5 percent Indian in-river harvest, and a 35,000 escapement floor.

As noted above, the Secretary of Commerce can not enforce a 32.5 percent in-river harvest, as the rivers running through the reservations are under the jurisdiction of the Department of the Interior. Nor do plaintiffs dispute that if the Department of Interior followed through on its stated intent to allow a 50 percent in-river Indian harvest, it would be virtually impossible to meet the 35,000 escapement floor; rather, the escapement would be at most 21,000, or only 61 percent of the 35,000 minimum. AR 12 at 26923.

Given the above, the Secretary of Commerce conferred with the Secretary of the Interior upon receiving the Council's recommendations. The result was an agreement whereby the Department of Interior agreed to limit the tribal fishery to a 44.6 percent share (or 18,500 chinook) while the Department of Commerce agreed to increase the escapement floor to 38,000 natural spawners in an effort to improve future stock and compensate for past failures to meet the 35,000 floor. AR 13 at 31665; AR 257. To accommodate these changes, the Secretary of Commerce also reduced the ocean harvest rate to 14.5 percent, well below the Council recommended 22 percent.

The Secretary's disapproval of the Council's recommendations were clearly based on his conclusion that it would be impossible to achieve the 35,000 escapement floor in the event of a 50 percent Indian harvest, particularly given the unsatisfactory escapement levels achieved over the last three years. AR 12 at 26922-23; AR 13 at 31664. The emergency regulation, he explained, would help to achieve the 35,000 floor, and thus serve to rebuild the Klamath chinook stock, and prevent further overfishing. "[T]he Department of Commerce believes that it is in the best long-term interest of the Klamath River fall chinook resource, the fishing industry, and the tribal fisheries, to achieve as large a spawning escapement as reasonably possible in 1993." AR 12 at 26923.[11]

---

10. In 1986, Judge Beezer on the Ninth Circuit made a pointed comment on the inequities of the situation. *Eberhardt,* 789 F.2d at 1363 (conc. opin.) ("[S]ince the Department of Commerce fails to provide for adequate escapement from the coastal waters, the Indians on the Hoopa Valley Reservation must bear most of the burden of conservation measures. While the Department of Interior has imposed a moratorium on commercial fishing by Indians, offshore, domestic and foreign commercial fisheries continue to harvest the same fish that spawn in the Klamath River basin ¶ ... The ocean fisheries have not been required to bear their full share of the conservation burden ¶ ... Until both the Department of the Interior and the Department of Commerce coordinate fishery management, the Indians will be denied their fair share ... of the available resource").

11. *See also,* Statement of Regional Director of National Oceanic and Atmospheric Administration urging disapproval of the Council's Klamath chinook recommendations:

> This year, as in the past three years, the Council has developed salmon seasons designed to yield Klamath River fall chinook spawning escapement equal to, or below, the escapement floor. In view of the fact that since 1989 natural spawning escapements to the Klamath River have ranged from 32 to 60 percent of the predicted escapements, the Departments of the Interior and Commerce have agreed that it is in the long-term interest of the Klamath fall chinook resource to set an escapement goal for 1993 above the floor, with the hope of at least attaining the floor.

AR 28 at 2.

The Secretary acknowledged that the emergency regulation would reduce the ocean commercial and recreational harvest in the ocean south of Cape Falcon, Oregon by about 89,000 fish.[12] AR 13 at 31665. The Secretary stated, however, that he had "balanced the conservation need for additional spawners against the economic impacts on the ocean fishery in this year, and [had] determined that a spawning escapement of 38,000 retained spawners is a reasonable accommodation of the competing needs." AR 12 at 26923. He justified the temporary increase as scientifically supportable because the Council's salmon technical team had recommended a minimum spawning escapement floor of 43,000 and the end of the drought offered the best opportunity to begin to rebuild the stock to levels that would support healthy and sustained harvests by both tribal and non-tribal fisheries. AR 13 at 31665.

As a legal matter, the Secretary argues that his rejection of the Council's Klamath chinook recommendations must be upheld because he had a reasonable basis for concluding that the recommendations were inconsistent with National Standard One of the Magnuson Act. We agree.

National Standard One provides that:

Conservation and management measures **shall prevent overfishing** while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

16 U.S.C. § 1851(a)(*l*) (emph. added).[13] The depressed state of the Klamath chinook salmon stock and the need to rebuild it has been recognized for some time. AR 4, AR 141, AR 144. The December 1988 Amendment Nine, which set a *minimum* escapement floor of 35,000 was adopted as a necessary measure to achieve this goal. See AR-4. Given that the Council's past management measures have proved wholly unsuccessful in achieving the needed escapement, and the promise of a 50 percent Indian in-

river harvest, it was eminently reasonable for the Secretary to conclude that a 22 percent ocean harvest rate would almost certainly result in yet another failed effort to achieve the minimum 35,000 escapement floor.

The result would be four years of overfishing of the Klamath stock (representing an entire life cycle), which would substantially impact the restoration and maintenance of a viable Klamath chinook population. AR 141, 144, 163, 210. As such, the Secretary could rationally conclude that the Council's Klamath chinook recommendations were inconsistent with his obligation to prevent "overfishing" under National Standard One. See, Brennan, 958 F.2d at 934 (Secretary must disapprove fishery management plan that does not comply with the National Standards).

■ Plaintiffs emphasize that the Councils are not meaningless advisory boards, and that the entire Magnuson Act scheme is premised on the Councils having a "meaningful role" in the process. This is certainly true; however, it is equally true that the Secretary's role is not to simply act as a rubberstamp for Council recommendations. Rather, the statute clearly charges the Secretary with reviewing the Council's recommendations, and places ultimate responsibility for compliance with Magnuson Act standards in that office. 16 U.S.C. § 1854(a)(1), (b)(1), (2).

Given all of the circumstances presented here, we can not find that the Secretary acted arbitrarily and capriciously in rejecting the Council's recommendations. Accordingly, his actions can not be judicially overturned on this ground. Cf. Washington Crab, 924 F.2d at 1449 ("As the Secretary has explained, his concern is with adequate escapement to perpetuate the various salmon species to enable the industry and sport to continue, and in particular, to see that the Indians get their allocated share in accordance with the treaties. Given this stated

---

12. This relatively high figure reflects the fact that in order to allow 3,000 additional Klamath chinook spawners to escape, other types of fish who swim in their vicinity must also be allowed to escape capture as well.

13. The Secretary has defined "overfishing" as "a level or rate of fishing mortality that jeopardizes the long-term capacity of a stock or stock complex to produce [maximum sustainable yield] on a continuing basis." 50 C.F.R. § 602.11(c)(1) (1989).

objective, the Secretary was correct to respond to this complaint as he did").

(2) Whether the Secretary's Emergency Regulation Violates Certain of the National Standards under the Magnuson Act.

In addition to arguing that the Secretary improperly rejected the Council's Klamath chinook recommendations, plaintiffs contend that the Secretary's substitute emergency regulation is arbitrary and capricious because it is inconsistent with National Standards One, Two, and Four of the Magnuson Act.

A. *National Standard One*

■ National Standard One, quoted above, mandates conservation and management measures that prevent overfishing while achieving an "optimum yield" from the fishery. 16 U.S.C. § 1851(a)(1). As plaintiffs emphasize, and the Secretary acknowledges, his regulation will result in a loss of 89,000 catch for ocean fisheries, which will have significant economic consequences. On the other hand, the regulation will also preserve 3,000 more Klamath chinook for future spawning and increase the Indian in-river share by 1,100. *See* AR 12 at 26923; AR 257. Plaintiffs argue, however, that this lopsided cost-benefit violates the Secretary's duty to achieve an "optimum yield," as required by National Standard One.

Clearly, the 89,000 fish "cost" does not equal, in mathematical terms, the 4,100 fish "benefit"; however, such a discrepancy does not necessarily translate into a violation of National Standard One. The Act defines "optimum yield" in broad terms as the amount of the fish that will:

provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities; and ... which is prescribed as such on the basis of the maximum sustainable yield from such fishery, as modified by any relevant economic, social, or ecological factors.

16 U.S.C. § 1802(21). No formal "cost-benefit analysis" is required. *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir.1987). Nor is the Secretary required to demonstrate that he has chosen

"the least restrictive alternative available for managing the ... resource." *Id.* We are also mindful that the "optimum yield" requirement must be viewed in light of other language in National Standard One, which is aimed at avoiding overfishing.

Given the Administrative Record, the Secretary could rationally conclude that reducing the overall harvest and preserving spawners for future generations, would provide the "greatest overall benefit to the Nation" by aiding the Nation's long term interest in restoring depressed Klamath salmon stocks to healthy levels. The "numerical" cost-benefit disparity, while relevant, is clearly not dispositive under either the Act or Ninth Circuit authority.

It is also clear that the Secretary "balanced the conservation need for additional spawners against the economic impacts of the ocean fishery in this year." AR 12 at 26923. Where the Secretary has balanced the relevant economic and ecological factors, and related them to his conclusions, the Courts are less likely to disturb challenged regulatory action. *See Washington Crab*, 924 F.2d at 1149 ("The Secretary's interpretation of his duties and obligations are reasonable in that he 'has considered the relevant factors [under the Magnuson Act] and articulated a rational connection between the facts found and the choice made'").

Accordingly, we decline to find that the Secretary's action was arbitrary and capricious on the ground that the emergency regulation conflicts with National Standard One.

*National Standard Four*

■ Plaintiffs argue that the 89,000–4,100 disparity discussed above also violates National Standard Four because it establishes an unfair and inequitable distribution among fishermen. National Standard Four provides in part that:

If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation, and (c) carried out in such manner that no particular individual, cor-

poration or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). The Secretary's regulation was premised on an Indian harvest of 44.6 percent and a non-Indian harvest of 55.4 percent. Given that the Secretary was required to consider the requirements of the Indian in-river fishery, and the Interior Secretary's position that the Hoopa Valley and Yurok Indians were entitled to a 50 percent share, the Secretary could reasonably conclude that this distribution was "fair and equitable" for purposes of National Standard Four.

*National Standard Two*

■■■■■■ Plaintiffs also contend that the Secretary's decision to increase the escapement floor from 35,000 to 38,000, and reduce the ocean harvest level to 14.5 percent, violated National Standard Two, which provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). By requiring that decisions be based on the best scientific information *available*, the Act acknowledges that such information may not be exact or totally complete. *See e.g., Washington Crab*, 924 F.2d at 1448–49.

Plaintiffs contend that the Secretary's deviations from the Council's recommendations find no scientific support in the Administrative Record, and that it is the Council's recommendations that are based on "the best scientific information available." Accordingly, they argue, the Secretary lacks any rational basis for finding that his emergency regulation comports with National Standard Two.

As held above, the Secretary was entitled to reject the Council's Klamath chinook recommendations because, by failing to compensate for a sufficient in-river Indian harvest, they were likely to result in overfishing for a fourth consecutive year. As such, the Secre-

tary was entitled to address this problem by accommodating a higher Indian in-river share than the Council recommended share of 32.5 percent, while at the same time protecting the minimum 35,000 spawning floor.

■■■■ However, the particular manner by which the Secretary chooses to address the problem must have some support in the Administrative Record, such that the Secretary may reasonably conclude that his chosen method is consistent with Magnuson Act National Standards, including National Standard Two. We conclude that while there may well be adequate support for the specific approach taken by the Secretary, it is not apparent in the current record which provides only conclusory assertions that the higher 38,000 escapement floor, and correspondingly reduced 14.5 percent ocean harvest rate, will achieve the Secretary's legitimate objectives.

For example, the Secretary, through his representatives, has stated that the higher 38,000 escapement floor represented his "best estimate" of the way to achieve his objectives while minimizing social and economic impacts. *See e.g.*, AR 252 at 7, 9. The Secretary, however, has not pointed to anything in the record which specifically explains why this is his "best estimate" or how it is based on the "best scientific information available."

■■■■ While the Secretary has noted that the Salmon Technical Team recommended a 43,000 escapement floor, there is no nonconclusory analysis supporting a 38,000 floor in the record. Nor has the Secretary pointed to any specific explanation for his conclusion that a 38,000 escapement floor will help achieve a 35,000 floor. Again, this is not to say that such analysis or justification could not be shown, but rather that such justification is not apparent in the current record.[14]

---

14. The Secretary has also noted that his decision to increase the escapement floor was supported by the fact that this year marked the end of a drought. However, there is little in the current record to specifically support this justification. At argument, counsel for the Secretary stated that this was simply a matter of "general knowl-

edge." However, the issue of how the drought's end should impact planning for the instant fishing season was a matter of some dispute. Under these circumstances, the Court is not persuaded that it is sufficient for the Secretary to simply assert that "general knowledge" supports his justification.

■ The Secretary acknowledges that the 38,000 floor was part of a compromise negotiated with the Secretary of the Interior concerning Indian In–River harvest rates. There is nothing improper with compromise *per se.* Indeed, much of the Magnuson Act process is designed to facilitate compromise between various competing interests. *See also, Eberhardt,* 789 F.2d at 1363 (conc. opin.) (cooperation among government agencies essential to preserve Indian fishing rights). However, the purpose of the Magnuson Act is to ensure that such compromise decisions are adequately explained and based on the best scientific evidence available—and not simply a matter of political compromise.

We acknowledge that, under the circumstances presented here, the Secretary was required to act under significant time constraints. New technical studies were neither practicable nor expected. Nonetheless, the escapement floor raises an issue of great significance to many, and we can not relieve the Secretary of his duty to demonstrate, through concrete analysis, that he could rationally conclude that his approach would accomplish his legitimate objectives based on the best scientific information available.

(3) Whether There was a Reasonable Basis for Invoking Emergency Powers

■ Congress expressly vested the Secretary with authority to impose emergency regulations in appropriate circumstances. Specifically, 16 U.S.C. § 1855(c) provides in part that "[i]f the Secretary finds that an emergency exists involving any fishery, he may promulgate emergency regulations necessary to address the emergency." The Court's only inquiry in this regard is whether the Secretary has made "a reasonable finding that an emergency exists." *Pacific Coast,* 494 F.Supp. at 633. In resolving this question, we may not presume bad faith on the part of the Secretary. *Id.*

■ Plaintiffs emphasize that emergency action should "not be based on administrative inaction to solve a long recognized problem." 57 F.R. No. 3 at 375 (January 6, 1992). Here, they argue, the Secretary unfairly conjured up a crisis, based on the longstanding, unresolved question of the extent of the Yurok and Hoopa Valley tribes' in-river fishing rights. While this argument may have some appeal on the surface, it loses force once we find that the Secretary had a reasonable basis for rejecting the Council's recommendations in order to avoid further overfishing of the Klamath chinook.

All parties agree that once the Secretary rejected the Council's recommendations, the fishing season, scheduled to open May 1, 1993, could not go forward unless the Secretary promulgated substitute emergency regulations.[15] AR 12 at 26922–23; AR 20. Thus, the Secretary was required to invoke his emergency authority in order to avoid the severe economic harm that would result should the season fail to occur at all. AR 13 at 31664.

The Federal Register provides that "Congress intended that emergency authority be available to address conservation, biological, economic, and social emergencies." 57 F.R. No. 3 at 375. It further specifies that an emergency justification may be "ecological" or "economic—to prevent significant direct economic loss or to preserve a significant economic opportunity that otherwise might be foregone." *Id.* Once the Secretary was justified in rejecting the Council's recommendations, the economic consequences of not opening the season clearly provided a reasonable basis for the Secretary's finding that there was an "emergency" that warranted invocation of his emergency powers.

## PROCEDURAL ARGUMENTS

■ As discussed above, plaintiffs also contend that the Secretary's action should be invalidated on three procedural grounds. Specifically, plaintiffs contend that the Secretary's action was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because (1) the Secretary failed to comply with procedures in the APA, 5 U.S.C. § 553, (2) The Secretary failed to comply with procedures for changing the escapement floor set forth in the Fishery Management Plan, and (3) the Secretary's meet-

---

**15.** The Secretary did give the Council an opportunity to provide revised recommendations but it declined to recommend an alternative consistent with the Secretary's approach.

ings with the Secretary of the Interior violated the "Sunshine Act," 5 U.S.C. § 552b.

### 1. *APA Procedures*

Plaintiffs object that the Secretary issued his emergency regulation without complying with standard APA notice and comment rule making procedures. *See* 5 U.S.C. § 553. It is unclear whether section 553 applies in this context, given that annual management measures approved by the Secretary are implemented simply by notice published in the Federal Register. However, even assuming the general applicability of section 553, the APA contains an exception for situations where the agency for "good cause" finds that notice and public procedure would be impracticable. 5 U.S.C. §§ 553(b)(B), 553(d)(3).

Here, we have already held that the Secretary had a reasonable basis for finding that emergency, expedited action was warranted to avoid closure of the fall fishing season. We conclude that such a finding under the Magnuson Act satisfies the "good cause" requirement under the APA. *See Northern Arapahoe Tribe v. Hodel,* 808 F.2d 741, 751 (10th Cir.1987) (good cause exception designed for instances where "delay would do real harm").

### 2. *Fishery Management Plan Procedures*

The Framework FMP provides that the escapement floor can only be modified by amendment to the FMP. 50 C.F.R. § 661, Appendix at IV.A., n. 3. Plaintiffs object that there has been no such amendment. However, the Magnuson Act expressly states that an emergency regulation "shall be treated as an amendment to such plan for the period in which such regulation is in effect." 16 U.S.C. § 1855(c)(3). Given our holding that the Secretary properly invoked his emergency authority, the emergency regulation issued functions as a temporary amendment to the FMP. Accordingly, the Secretary's action did not conflict with FMP required procedures.

### 3. *Sunshine Act*

Finally, plaintiffs argue that the Secretary violated the "Sunshine Act" by privately meeting with the Secretary of the Interior to discuss coordination of Indian in-river and ocean harvest fishing rates. The Sunshine Act, 5 U.S.C. § 552b, provides that agency meetings shall generally be open to the public. However, the term "agency" is defined as an agency that is headed by a "collegial body composed of two or more individual members." 5 U.S.C. § 552b(a)(1). Because the Department of Commerce is headed by a single person, not a collegial body, this provision does not apply.

Plaintiffs also complain that the Secretary's meetings with Interior Secretary Babbitt constituted improper "ex parte contacts" in violation of 5 U.S.C. § 557(d)(1). However, this provision only applies to formal rulemakings or adjudications. 5 U.S.C. § 557(a). *See, Portland Audubon Society v. Endangered Species Committee,* 984 F.2d 1534, 1540 (9th Cir.1992); *cf. Sierra Club v. Costle,* 657 F.2d 298, 406–407 (D.C.Cir.1981). Accordingly, we find no violation of the Sunshine Act.

## CONCLUSION

For the reasons set forth above, and good cause appearing, it is HEREBY ORDERED that (1) Defendants' Motion to Strike Affidavits is granted, and (2) Plaintiffs' and Defendants' Motions for Partial Summary Judgment are granted in part, and denied in part, consistent with this Order.

The Court upholds the Secretary's rejection of the Council's Klamath chinook recommendations, and his invocation of emergency powers under the Magnuson Act. The Court also rejects plaintiffs' contentions of procedural irregularities. However, the Court can not validate the Secretary's action increasing the escapement floor to 38,000 based on the current record for the reasons set forth above. Under the circumstances, we conclude that the most appropriate course of action is to remand the matter to the Secretary of Commerce for reconsideration and further proceedings consistent with this decision. *Asarco,* 616 F.2d at 1159; *Kreps,* 563 F.2d at 1054.

Upon remand, the Secretary may either supply additional explanation for its decision

to increase the spawning escapement floor to 38,000 or use his emergency authority to approve any other spawning escapement floor and ocean harvest rate, for the duration of the emergency regulation, which he could reasonably find is supported by the Administrative Record and is consistent with the Magnuson Act and other applicable law. This ruling is not intended to affect any aspect of the Secretary's emergency regulation except with respect to those provisions directed to the Klamath River fall Chinook as discussed in this order.

IT IS SO ORDERED.