70 F.3d 539
 26 Envtl. L. Rep. 20,232, 95 Cal. Daily Op.
Serv. 8761,
95 Daily Journal D.A.R. 15,182
 Pietro PARRAVANO; Wayne Heikkila; Marguerite Dodgin; Earl
Carpenter; David Bitts; Liz Henry; Norman L. De Vall;
Pacific Coast Federation of Fishermen's Associations, Inc.;
Humboldt Fishermens' Marketing Association; Caito
Fisheries, Inc.; Golden Gate Fisherman's Association;
Salmon Trollers Marketing Association, Plaintiffs-Appellants,
v.
Bruce BABBITT, Secretary of the United States Department of
Interior; Ron Brown, Secretary, United States
Department of Commerce, Defendants-Appellees,
and
Sue MASTEN, Intervenor-Appellee.
 No. 94-16727.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided Nov. 16, 1995.
 
 James M. Johnson, Olympia, Washington, for plaintiffs-appellants.
 Jacques B. Gelin, United States Department of Justice, Washington, DC, for defendants-appellees.
 George Forman, Alexander & Karshmer, Berkeley, California, for intervenor-appellee.
 Thomas F. Gede, Special Assistant Attorney General, Sacramento, California, for amicus States of California, Idaho, Nevada, North Dakota, Oklahoma, South Dakota and Vermont.
 Thomas P. Schlosser, Morisset, Schlosser, Ayer & Jozwiak, Seattle, Washington, for amicus Hoopa Valley Tribe.
 Appeal from the United States District Court for the Northern District of California.
 Before: SKOPIL, PREGERSON, and FERNANDEZ, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Pietro Parravano, other commercial fishermen, and commercial fishing associations (collectively "Parravano") appeal the district court's order granting partial summary judgment in favor of defendants Interior Secretary Babbitt and Commerce Secretary Brown and dismissing the remainder of Parravano's claims.
 
 
 2
 In United States District Court, Parravano alleged that Secretary Brown violated the Magnuson Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. Sec. 1801 et seq., when he issued an emergency regulation that reduced the ocean harvest rate of Klamath River chinook for the fall 1993 season. The district court determined that executive orders issued in 1876 and 1891 and the 1988 Hoopa-Yurok Settlement Act, 25 U.S.C. Sec. 1300i et seq., vested the Hoopa Valley and Yurok Tribes (the "Tribes") with federally reserved fishing rights. The district court found that these fishing rights constituted "any other applicable law," 16 U.S.C. Sec. 1854(a)(1)(B), which the Secretary of Commerce could take into consideration when reviewing fishery management policies under the Magnuson Act. For this reason, the district court concluded that Secretary Brown did not violate the Magnuson Act when he issued emergency regulations for the fall 1993 ocean harvest.
 
 
 3
 Parravano also charged that Secretary Babbitt failed to comply with the Klamath River Basin Fishery Resources Restoration Act ("Klamath Act"), 16 U.S.C. Sec. 460ss, and the Trinity Basin Act ("Trinity Act"), Pub.L. No. 98-541, by failing to enforce limitations on Indian fishing in the Klamath River. The district court dismissed the claims against Secretary Babbitt, concluding that there was no basis for judicial review under the Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq., and that Parravano did not have standing because there was neither an explicit nor an implicit private right of action under the Klamath and Trinity Acts.[1] Parravano now appeals.
 
 
 4
 We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm for the same reasons stated by the district court in its orders published at 837 F.Supp. 1034 (N.D.Cal.1993) and 861 F.Supp. 914 (N.D.Cal.1994). Accordingly, we adopt those portions of the district court orders relating to the issues raised by Parravano on appeal. We write only to emphasize that Indian fishing rights, whether they arise from treaty, statute, or executive order, are to be treated the same under the Magnuson Act.
 
 BACKGROUND
 
 5
 We incorporate by reference the factual background to this case as set forth by the district court at 837 F.Supp. at 1038-39 and 861 F.Supp. at 917. We discuss only those facts relevant to the issues raised on appeal.
 
 
 6
 * The Klamath River fall chinook salmon is an anadromous fish that takes its name from the Klamath River where it spawns. By their very nature, anadromous fish live transient lives. They hatch in the upper tributaries of rivers such as the Klamath and migrate down to the Pacific Ocean where they spend much of their adulthood. At the age of three or four years, they instinctively return to the tributaries of their natal river where they spawn and then die. For generations, the Hoopa Valley and Yurok Indian tribes have depended on the Klamath chinook salmon for their nourishment and economic livelihood. See Arnett v. 5 Gill Nets, 48 Cal.App.3d 454, 121 Cal.Rptr. 906, 907-909 (1975); cert. denied, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976); Memorandum from John D. Leshy, Solicitor of the Department of the Interior to the Secretary of the Interior 8 (Oct. 4, 1993) ("Interior Solicitor's Opinion"). In the past, we have observed that the Tribes' salmon fishery was "not much less necessary to [their existence] than the atmosphere they breathed." Blake v. Arnett, 663 F.2d 906, 909 (9th Cir.1981) (internal quotations omitted).
 
 
 7
 In 1876, President Grant issued an executive order formally establishing a reservation for the Tribes "to be set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by Act of Congress approved April 8, 1864." I.C. Kappler, Indian Affairs: Laws and Treaties 815 (1904). In the years following the 1876 executive order, non-Indians encroached upon the Indian fisheries along the Klamath River, challenging the Indians' fishing rights. Interior Solicitor's Opinion, at 6. To resolve this problem, in 1891 President Harrison issued another executive order under the authority of the 1864 Act. See Donnelly v. United States, 228 U.S. 243, 258-59, 33 S.Ct. 449, 453-54, 57 L.Ed. 820 (1913), modified on other grounds, 228 U.S. 708, 33 S.Ct. 1024, 57 L.Ed. 1035 (1913). The 1891 order extended the Hoopa Valley Reservation to include the old Klamath Reservation and the strip of land connecting the two reservations. See Mattz v. Arnett, 412 U.S. 481, 493-94, 93 S.Ct. 2245, 2252-53, 37 L.Ed.2d 92 & app. (1973). Together, the 1876 and 1891 executive orders created the extended Hoopa Valley Reservation, which ran along both sides of the Klamath River, from the mouth of the Trinity River down to the Pacific Ocean. See id.
 
 
 8
 In 1988, Congress enacted the Hoopa-Yurok Settlement Act to divide the extended Hoopa Valley Reservation into the Yurok Reservation and Hoopa Valley Reservation. 25 U.S.C. Sec. 1300i. One of the concerns of Congress at the time of the 1988 partitioning was to protect the Tribes' fisheries. See Partitioning Certain Reservation Lands Between the Hoopa Valley Tribe and the Yurok Indians, to Clarify the Use of Tribal Timber Proceeds, and For Other Purposes, S.Rep. No. 564, at 14-15; H.R.Rep. No. 938, Pt. 1, at 20.
 
 II
 
 9
 Congress enacted the Magnuson Act, 16 U.S.C. Sec. 1801, to conserve ocean fishing resources and to protect these resources from foreign fishing. The Magnuson Act delegated to the Secretary of Commerce the authority to set harvest levels in ocean fisheries located between three and two hundred nautical miles offshore, 16 U.S.C. Sec. 1851. The Magnuson Act also established regional Fishery Management Councils, which are charged with recommending to the Secretary of Commerce ocean harvest limits and salmon "escapement" levels.[2] 16 U.S.C. Sec. 1852. The Secretary of Commerce reviews the regional councils' recommendations for consistency with the national standards set forth in the Magnuson Act and "any other applicable law." 16 U.S.C. Sec. 1854(a)(1)(B).[3] The Magnuson Act, however, does not require the Secretary to follow a regional council's recommendations; he may reject them and, when necessary, promulgate ninety-day emergency regulations in their stead. 16 U.S.C. Secs. 1854, 1855(b).
 
 
 10
 The regional council charged with formulating recommendations for the Klamath River chinook harvest is the Pacific Fishery Management Council ("Pacific Council"). Through the fall of 1993, Pacific Council had consistently failed to set harvest regulations sufficient to meet conservation requirements, forcing the Interior Department to severely curtail Indian salmon harvesting in the Klamath River. According to the Interior Department, this failure was adversely affecting the Tribes' reservation fisheries. See Letter from Eddie F. Brown, Assistant Secretary for Indian Affairs, Department of the Interior, to Barbara Hackman Franklin, Secretary of Commerce, 1-3 (May 19, 1992) ("Brown Letter"). Seeking a more equitable distribution of the Klamath chinook resource, Secretary Babbitt met with Secretary Brown to coordinate regulation of the fall 1993 harvest. Secretary Babbitt informed Secretary Brown that the Interior Department believed that the Tribes were entitled to a fifty-percent share of the total Klamath chinook harvest and that ocean harvesting of this salmon would have to be curtailed so that a sufficient number of the fish could reach the Klamath River for tribal harvests as well as for spawning. See Interior Solicitor's Opinion, at 27.
 
 
 11
 On April 14, 1993, Pacific Council recommended harvest levels for the fall season. Although Secretary Brown had announced his desire to issue regulations consistent with providing the Tribes with a fifty-percent allocation of the salmon, Pacific Council authorized a 22% ocean harvest rate, with a spawning escapement floor of 35,000 fish. These ocean harvest levels exceeded the levels necessary to reserve fifty percent of the harvest for the Tribes' Klamath River fisheries. Faced with the possibility that Pacific Council's recommended ocean harvest levels would either fail to meet Magnuson Act goals or would compromise the resource rights of the Tribes, Secretary Brown suspended Pacific Council's regulations. Because of the imminent commencement of the fall 1993 season, he issued ninety-day emergency regulations that set a lower ocean harvest rate of 14.5% and a higher salmon escapement floor of 38,000 fish for the fall 1993 season.
 
 STANDARDS OF REVIEW
 
 12
 We review the district court's grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), petition for cert. filed, 64 U.S.L.W. 3271 (Sept. 20, 1995). We review interpretations of statutes and regulations de novo. Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 783 (9th Cir.1995) (statute); Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 918 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995) (regulation). With respect to an action taken by the Secretary of Commerce under the Magnuson Act, we have limited judicial review, 16 U.S.C. Sec. 1855(b), and may only invalidate the challenged action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); Pacific Coast Federation of Fishermen's Ass'ns v. Secretary of Commerce, 94 F.Supp. 626, 627-28 (N.D.Cal.1980).
 
 
 13
 As for Indian affairs, we must assume that the Department of the Interior has been given reasonable power to discharge effectively its broad responsibilities in this area. United States v. Eberhardt, 789 F.2d 1354, 1361 (9th Cir.1986); Udall v. Littell, 366 F.2d 668, 672 (D.C.Cir.1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967) Thus, although we review questions of statutory interpretation de novo, in reviewing the Secretary's actions, we give substantial deference to his interpretation of the applicable statutes and executive actions that give rise to tribal rights. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
 
 
 14
 Statutory interpretation and standing issues raised under the Klamath and Trinity Acts are reviewed de novo. See ACF Indus., Inc. v. California State Bd. of Equalization, 42 F.3d 1286, 1289 (9th Cir.1994).
 
 
 15
 CONSTRUCTION OF STATUTES AND EXECUTIVE ORDERS ESTABLISHING,
 
 MODIFYING OR EXTINGUISHING INDIAN RESERVATIONS
 
 16
 The rule of construction applicable to executive orders creating Indian reservations is the same as that governing the interpretation of Indian treaties. Executive orders, no less than treaties, must be interpreted as the Indians would have understood them "and any doubtful expressions in them should be resolved in the Indians' favor." Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970); United States v. State of Washington, 969 F.2d 752, 755 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993). In interpreting statutes that terminate or alter Indian reservations, we construe ambiguities in favor of the Indians. DeCoteau v. District County Court for Tenth Judicial Dist., 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975); Confederated Salish and Kootenai Tribes of Flathead Reservation, Mont. v. Namen, 665 F.2d 951, 955 (9th Cir.1982), cert. denied, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982). Rights arising from these statutes must be interpreted liberally, in favor of the Indians. Pacific Coast, 494 F.Supp. at 633 n. 6 (citing Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912)).
 
 ANALYSIS
 
 17
 Under the Magnuson Act, the Secretary of Commerce may issue emergency regulations to achieve consistency with the national standards set forth in the Act and "any other applicable law." 16 U.S.C. Secs. 1853(a)(1)(C), 1854(a)(1)(B). Indian fishing rights that exist under federal law may constitute "any other applicable law." Washington State Charterboat Ass'n v. Baldrige, 702 F.2d 820, 823 (9th Cir.1983), cert. denied, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 194 (1984) (Northwest Indian treaty fishing rights constitute "other applicable law" under Magnuson Act). Therefore, the question before this court is whether the Hoopa Valley and Yurok Tribes retain federally reserved fishing rights that constitute "any other applicable law" within the meaning of the Magnuson Act. They do.
 
 
 18
 * Parravano contends that the Tribes hold no fishing rights that constitute "other applicable law" within the meaning of the Magnuson Act because their reservations were created not by treaty but by executive orders authorized by Congress. The problem with Parravano's position is threefold. First, a treaty/executive order distinction has no historical or legal significance with respect to the Tribes involved here. Second, a treaty/executive order distinction contradicts the doctrine that the grant of hunting and fishing rights is implicit in the setting aside of a reservation "for Indian purposes." Third, a treaty/executive order distinction is inconsistent with the well-established federal trust obligation owed to the Indian tribes.
 
 
 19
 Parravano argues that affording equal dignity to tribal fishing rights emanating from executive orders unfairly grants rights to executive order reservation tribes. He asserts that such a holding would debase the rights of treaty tribes. Parravano reasons that enforcing the Tribes' fishing rights would grant promises made to Indian tribes through executive order the same solemnity as promises made to tribes by treaty. These arguments are unpersuasive and contrary to federal law and policy.
 
 
 20
 We have long held that when it comes to protecting tribal rights against non-federal interests, it makes no difference whether those rights derive from treaty, statute or executive order, unless Congress has provided otherwise. See, e.g., United States v. Southern Pac. Transp. Co., 543 F.2d 676, 685-86 (9th Cir.1976); Gibson v. Anderson, 131 F. 39, 41-42 (9th Cir.1904); McFadden v. Mountain View Mining & Milling Co., 97 F. 670, 673 (9th Cir.1899), rev'd on other grounds 180 U.S. 533, 21 S.Ct. 488, 45 L.Ed. 656 (1901).
 
 
 21
 With respect to the Hoopa Valley and Yurok Tribes, the California courts concluded nearly two decades ago that, as against non-federal interests, tribal rights derived from executive order are treated the same as treaty rights. In Arnett v. 5 Gill Nets, the California Court of Appeal acknowledged that the executive orders establishing the extended Hoopa Valley Reservation created recognizable fishing rights. See Arnett, 121 Cal.Rptr. at 907-909. In fact, the Arnett court sharply rejected a treaty/executive order distinction, aptly noting that the Hoopa Valley Reservation was created by executive order authorized by federal statute. See id. at 460, 121 Cal.Rptr. at 909-10.
 
 
 22
 In 1976, when the State of California petitioned the United States Supreme Court for certiorari in Arnett, the federal government opposed the petition, arguing that the fishing rights of these Tribes were tantamount to treaty rights. As Solicitor General Robert Bork explained to the Court:
 
 
 23
 That executive orders played a prominent role in the creation of the [Hoopa Valley] Reservation does not change this result [that the United States reserved to the Indians the right to fish on the Reservation without state interference]. Regardless of the manner in which a reservation is created the purpose is generally the same: to create a federally-protected refuge for the tribe....
 
 
 24
 With respect to fishing rights we see no reason why a reservation validly established by executive order should be treated differently from other reservations.
 
 
 25
 Memorandum for the United States as Amicus Curiae, at 5 (writing in opposition to California's petition for a grant of certiorari in Arnett ).
 
 
 26
 Solicitor General Bork's conclusion was well-founded. Although the Executive Branch engaged in treaty-making with the Indian tribes before 1871, in that year Congress decided that it would no longer negotiate treaties with the tribes. Congress thus suspended the entire process of treaty negotiation with the Indian tribes and delegated power to the President to create specified numbers of Indian reservations. 25 U.S.C. Sec. 71. "Reservations established after 1871 were accordingly created either by statute or, until Congress ended the practice in 1919, by executive order." William C. Canby, American Indian Law 17-18 (2d ed.1988).
 
 
 27
 Because of this historical background, we emphasize that there are no broad distinctions between Indian reservations created before 1871 and those created after. Although their manner of creation is different, they are substantively the same, at least with respect to non-federal interests. We agree with the observation that:
 
 
 28
 [M]any federal Indian law decisions, especially those dealing with developments since the mid-nineteenth century, turn not on treaty language, but on the text of seemingly more mundane instruments of law, such as statutes, executive orders, and federal regulations.... This difference in form should not, however, substantially alter judicial methodology. Some of these non-treaty enactments embody agreements with tribes that would have been handled by treaty in former eras.
 
 
 29
 Philip P. Frickey, Marshalling Past and Present: Colonialism, Constitutionalism and Interpretation in Federal Indian Law, 107 Harv.L.Rev. 381, 421 & n. 164 (1993).
 
 
 30
 With Congress's authorization, the 1876 and 1891 executive orders first created and then extended a reservation "for Indian purposes" along the main course of the Klamath River. Donnelly, 228 U.S. at 253, 33 S.Ct. at 451. We have never encountered difficulty in inferring that the Tribes' traditional salmon fishing was necessarily included as one of those "purposes." See United States v. Wilson, 611 F.Supp. 813, 817-18 (N.D.Cal.1985), rev'd on other grounds sub. nom., United States v. Eberhardt, 789 F.2d. 1354 (9th Cir.1986). Our interpretation accords with the general understanding that hunting and fishing rights arise by implication when a reservation is set aside for Indian purposes. See Menominee Tribe v. United States, 391 U.S. 404, 406, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968); Pacific Coast, 494 F.Supp. at 632. Thus, we reject Parravano's novel theory that ambiguity in the phrase "for Indian purposes" should be resolved against the Tribes.
 
 
 31
 In partitioning the original reservation in 1988, Congress recognized the importance of the Tribes' rights to fish along the Klamath River. Although the 1988 Hoopa-Yurok Settlement Act did not explicitly set aside fishing rights, it did make clear that the partitioning would not dispossess the Tribes of their assets. The legislative history of the 1988 Act indicates that Congress was aware that each Tribes' interests in their salmon fisheries was one of its principal assets. For example, Congress explained that:
 
 
 32
 The legislation will also establish and confirm the property interests of the Yurok Tribe in the Extension, including its interest in the fishery, enabling the Tribe to organize and assume governing authority in the Extension.
 
 
 33
 S.R. 564, 100th Cong., 2d Sess., 2-9 (1988); H.R. 938, Pt. 1, 100th Cong., 2d Sess., 8-15. Given this legislative history, we cannot accept Parravano's invitation to interpret the 1988 Hoopa-Yurok Settlement Act as a divestiture of the Tribes' federally reserved fishing rights. Barring explicit Congressional instructions to the contrary, we must construe any ambiguities in the executive orders and in the 1988 Hoopa-Yurok Settlement Act in the Tribes' favor. See DeCoteau, 420 U.S. at 444, 95 S.Ct. at 1092; Confederated Salish and Kootenai Tribes, 665 F.2d at 955.
 
 
 34
 We have noted, with great frequency, that the federal government is the trustee of the Indian tribes' rights, including fishing rights. See, e.g., Joint Bd. of Control v. United States, 862 F.2d 195, 198 (9th Cir.1988). This trust responsibility extends not just to the Interior Department, but attaches to the federal government as a whole. Eberhardt, 789 F.2d at 1363 (Beezer, J., concurring); see also Pyramid Lake Paiute Tribe v. United States Dept. of Navy, 898 F.2d 1410, 1420 (9th Cir.1990); Covelo Indian Community v. FERC, 895 F.2d 581, 586 (9th Cir.1990). In particular, this court and the Interior Department have recognized a trust obligation to protect the Yurok and Hoopa Valley Tribes' rights to harvest Klamath chinook. See Eberhardt, 789 F.2d at 1359-62; Interior Solicitor's Opinion, at 29.
 
 
 35
 Secretary Brown fulfilled his federal trust obligations by issuing emergency regulations for the fall 1993 ocean harvest of Klamath chinook. The Secretary acted in response to ocean overharvesting of Klamath chinook which threatened the Tribes' ability to harvest their share of the salmon. Parravano, 861 F.Supp. at 914. Upon these facts, we agree with the district court that Secretary Brown did not act arbitrarily or capriciously when he chose to reformulate Pacific Council's fishing recommendations to guarantee that the Tribes would receive their fair share of the salmon harvest.
 
 II
 
 36
 Parravano argues that even if the Tribes have fishing rights, these rights cannot extend outside of the reservation because they do not derive from a treaty. According to this reasoning, because the Tribes' fishing rights arise out of executive orders, the Secretary of Commerce cannot regulate ocean fishing in order to protect Indian salmon harvests. We rejected a similar argument in Washington Charterboat. There, we found that there is "nothing in the language of the Magnuson Act or in its legislative history that even remotely suggests that Congress intended to abrogate or modify" Indian treaties which included salmon fishing rights. Washington Charterboat, 702 F.2d at 823. Because we reject a broad treaty/executive order distinction, especially with regard to the Hoopa Valley and Yurok Tribes' fishing rights, Washington Charterboat applies here.
 
 
 37
 The Klamath chinook is an anadromous species. As a result, successful preservation of the Tribes' on-reservation fishing rights must include regulation of ocean fishing of the same resource. Indeed, allowing ocean fishing to take all the chinook available for harvest before the salmon can migrate upstream to the Tribes' waters would offer no protection to the Indians' fishing rights. We must conclude, as we did in Washington Charterboat, that the Tribes' federally reserved fishing rights are accompanied by a corresponding duty on the part of the government to preserve those rights.
 
 
 38
 Our conclusion is not a new one. Nearly a decade has elapsed since Judge Beezer of this court first observed uncoordinated regulation of Pacific Ocean fishing and the Tribe's fisheries. See United States v. Eberhardt, 789 F.2d 1354, 1363 (9th Cir.1986) (Beezer, Circuit Judge, concurring). He noted then, as we note now, that overharvesting of the Klamath chinook in the Pacific Ocean results in dwindling numbers of salmon able to survive for spawning. Id.; Brown Letter at 1-3. Low spawning levels, in turn, reduce further the number of Klamath chinook available for future harvests, thus creating long-term conservation concerns. See Eberhardt, 789 F.2d at 1363 (Beezer, Circuit Judge, concurring).
 
 
 39
 Specific harm to the Indians' fisheries is clear. The low numbers of salmon escaping Pacific trolling has forced the Department of the Interior to preserve a sufficient number of salmon for spawning by dramatically reducing the number of salmon that the Tribes are allowed to harvest. The government has continued to allow ocean fishermen to overharvest the Klamath chinook. This ocean overharvesting has reduced the number of salmon remaining for upstream reproduction and, as a result, has only increased the conservation burden placed on the Tribes. Id.; see also Brown Letter, at 1-3.
 
 
 40
 Given Pacific Council's past reluctance to set ocean harvest levels that would guarantee adequate upstream spawning for conservation of the Klamath chinook, as well as the imminent harm that would befall the Tribes if ocean overharvesting were allowed to continue, Secretary Brown had ample justification for an emergency departure from Pacific Council's recommendations. Indeed, the Magnuson Act requires the Secretary to scrutinize carefully the suggested harvest levels promulgated by the regional councils. When the councils' recommendations threaten conservation goals or undermine other federal laws and obligations, the Secretary must reject them. If the councils refuse to comply with national standards or "any other applicable law," the Secretary may need to issue emergency regulations. Here, Secretary Brown issued emergency regulations to conserve salmon runs and to ensure consistency with "any other applicable law," which includes the Tribes' federally reserved fishing rights. Parravano, 837 F.Supp. at 1042-44; 861 F.Supp. at 914. The district court therefore correctly held that Secretary Brown's actions were not arbitrary, capricious, or an abuse of discretion.
 
 CONCLUSION
 
 41
 We affirm the district court's orders. In so doing, we emphasize that Indian rights arising from executive orders are entitled to the same protection against non-federal interests as Indian rights arising from treaties. See Southern Pac. Transp. Co., 543 F.2d at 685-86.
 
 
 42
 Under the Magnuson Act, the Secretary of Commerce may issue regulations affecting coastal fishing to protect against violations of "other applicable law." The 1876 and 1891 executive orders that created the extended Hoopa Valley Reservation and the 1988 Hoopa-Yurok Settlement Act vested the Tribes with federally reserved fishing rights that constitute "other applicable law" within the meaning of the Magnuson Act.
 
 
 43
 Secretary Brown is a trustee of tribal interests as well as the administrator of the Magnuson Act; he properly considered the Tribes' federally reserved fishing rights in issuing emergency regulations reducing ocean harvest limits of the Klamath chinook.
 
 
 44
 Finally, because of the migratory nature of the Klamath chinook, the protection of upstream tribal fishing rights depends on coordinating regulation of ocean and river fishing.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 In district court, Parravano also charged that the actions of Secretaries Brown and Babbitt violated the Civil Rights Act, 42 U.S.C. Sec. 1981, the Freedom of Information Act ("FOIA"), 5 U.S.C. Sec. 552b, and the United States Constitution. The district court held that this action did not present any due process or equal protection violations. See Parravano v. Babbitt, 861 F.Supp. 914, 926-931 (N.D.Cal.1994). Parravano does not appeal these holdings
 
 
 [2]
 "Escapement" literally refers to the number of salmon that are allowed to "escape" harvest and to spawn
 
 
 [3]
 16 U.S.C. Sec. 1854(a)(1)(B) provides:
 (1) After the Secretary receives a fishery management plan, ... which was prepared by a Council, the Secretary shall--
 (B) Immediately commence a review of the management plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law.
 (Emphasis added).