282 F.3d 710
 MIDWATER TRAWLERS CO-OPERATIVE; West Coast Seafood Processors Association; Fishermen's Marketing Association, Plaintiffs-Appellants, and
State of Oregon; State of Washington, Plaintiffs,
v.
DEPARTMENT OF COMMERCE; the National Marine Fisheries Service; Donald Evans, Secretary of Commerce; Penelope D. Dalton, Assistant Administrator for Fisheries, National
Oceanic and Atmospheric Administration; William W. Stelle, Jr., Director, National Marine Fisheries Service, Defendants-Appellees,
Makah Indian Tribe, Defendant-Intervenor-Appellee,
v.
State of Oregon, Plaintiff-Intervenor.
Midwater Trawlers Co-Operative, Plaintiff, and
State of Oregon, Plaintiff-Appellant,
v.
Department of Commerce; Donald Evans, Secretary of Commerce; National Marine Fisheries Service; Penelope D. Dalton, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration; William Stelle, Jr., Director, National Marine Fisheries Service, Defendants-Appellees,
Makah Indian Tribe, Defendant-Intervenor-Appellee.
 No. 00-35717.
 No. 00-35853.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 7, 2002.
 Filed March 5, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED James P. Walsh, Davis Wright Tremaine LLP, San Francisco, California, for the plaintiffs-appellants.
 Hardy Myers, Attorney General; Michael D. Reynolds, Solicitor General; Jas. Jeffrey Adams, Assistant Attorney General, Salem, Oregon, for plaintiff-appellant State of Oregon.
 John C. Cruden, Acting Assistant Attorney General; Peter Monson, Sam Rauch, David C. Shilton, M. Alice Thurston, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC; Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington; for the defendants-appellees.
 David S. Vogel, Law Offices of David S. Vogel, P.L.L.C., Seattle, WA; Richard Reich, Office of the Reservation Attorney, Quinault Indian Nation, Mercer Island, WA; for amici curiae Quileute Tribe and Quinault Nation.
 Bill Tobin, Vashon, WA; Alix Foster, Swinomish Tribal Community, LaConner, WA; Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA; for amici curiae Tulalip Tribes of Washington, Swinomish Tribal Community, and Nisqually Indian Tribe.
 Appeal from the United States District Court for the Western District of Washington, Barbara J. Rothstein, Chief Judge, Presiding.
 Before: THOMAS, GRABER and GOULD, Circuit Judges.
 OPINION
 THOMAS, Circuit Judge.
 
 
 1
 We consider in this appeal a challenge by fishing industry groups and the States of Oregon and Washington to a federal regulation that increased the amount of Pacific whiting fish allocated to four Indian tribes. We affirm in part and reverse in part, with instructions to the district court to remand to the agency for more specific findings.
 
 
 2
 * Isaac I. Stevens, Washington's first Territorial Governor and the first Superintendent of Indian Affairs of the Washington Territory, negotiated a series of treaties in the mid-1850s involving a number of Indian tribes located in the Northwest.[1]
 
 
 3
 These treaties, commonly referred to as the "Stevens Treaties," reserved to the signing Tribes certain fishing rights. The treaties at issue in this action are the Treaty of Neah Bay, a treaty with the Makah Tribe; and the Treaty of Olympia, a treaty with the Quinault, Quileute and Hoh Tribes. As to the right of the Makah Tribe, the Treaty of Neah Bay provided that:
 
 
 4
 [t]he right of taking fish and of whaling or sealing at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the United States, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands: Provided, however, That they shall not take shellfish from any beds staked or cultivated by citizens.
 
 
 5
 Treaty of Neah Bay, 12 Stat. 939, art. 4 (1855).
 
 
 6
 We have construed similar treaty language[2] as entitling "the Tribes to take fifty percent of the salmon and other free-swimming fish in the waters controlled by Washington State." U.S. v. Wash., 135 F.3d 618 (9th Cir.1998), opinion amended and superceded by 157 F.3d 630, 638-39 (9th Cir.1998) ("Shellfish II").[3]
 
 
 7
 More than a century after the execution of the Stevens Treaties, Congress responded to concerns about preservation of the nation's fishery resources and enacted the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1883("the Magnuson-Stevens Act" or "the Act"). "The purpose of the Magnuson[Stevens] Act was to protect United States fisheries by extending the exclusive fisheries zone of the United States from 12 to 200 miles and to provide for management of fishing within the 200-mile zone." Wash. State Charterboat Ass'n v. Baldrige, 702 F.2d 820, 823-24 (9th Cir.1983) (citing H.R.Rep. No. 445, 94th Cong., 1st Sess. 21 (1975), reprinted in 1976 U.S.C.C.A.N. 593, 593-94).
 
 
 8
 The Magnuson-Stevens Act vested the National Marine Fisheries Service ("NMFS") of the Department of Commerce with the authority to issue fishery management regulations. 16 U.S.C. §§ 1853, 1855; see generally Wash. v. Daley, 173 F.3d 1158, 1162 (9th Cir.1999). However, under the Act, fishery management regulations must be consistent with "applicable law" defining Native American treaty fishing rights. See, e.g., Parravano v. Babbitt, 70 F.3d 539, 544 (9th Cir.1995). In 1996, the NMFS promulgated a regulation (the "Framework Regulation") that established a limit on the total number of Pacific whiting fish to be taken in any year and a framework for allocating these fish to the Hoh, Makah, Quileute, and Quinault Tribes. 50 C.F.R. § 660.324. The regulation stipulated coordinates that identified "usual and accustomed" fishing areas ("U & As") for the tribes, extending about forty miles into the ocean off the coast of Washington. Daley, 173 F.3d at 1163. In so doing, the NMFS recognized that the "Stevens Treaties" reserved rights to harvest Pacific whiting in the tribes' U & As. The Framework Regulation also made a specific allocation of 15,000 metric tons of Pacific whiting to the Makah Tribe for 1996.
 
 
 9
 Shortly after the 1996 regulation was enacted, Midwater Trawlers Co-operative, West Coast Seafood Processors, and the Fishermen's Marketing Association (collectively, "Mid-water"), the State of Oregon, and the State of Washington challenged the regulation and its annual allocations of Pacific whiting to the Makah. The action originally was brought in the Oregon federal district court, but was transferred to the federal district court in Washington. In 1997, the district court dismissed the plaintiffs' claims for failure to join the tribes as necessary and indispensable parties. In 1999, this Court reversed the dismissal of the claims and remanded for further proceedings. See Daley, 173 F.3d at 1169.
 
 
 10
 In 1999, Midwater and Oregon challenged in Oregon federal district court another NMFS regulation, which increased the 1999 amount of Pacific whiting allocated to the Makah Tribe to 32,500 metric tons. 64 Fed.Reg. 27928(May 24, 1999). This case was transferred to Washington federal district court and consolidated with the 1996 suit pending on remand. The federal government moved for summary judgment, which the district court granted in 2000 for all the cases. The Washington district court held that (1) the federal defendants did not act arbitrarily and capriciously in recognizing the tribes' right to harvest Pacific whiting, because the Stevens Treaties are "other applicable law" under the Magnuson-Stevens Act; (2) the Secretary of Commerce did not act arbitrarily and capriciously in recognizing the U & A fishing areas beyond the three-mile territorial limit off Washington's coast; and (3) the NMFS's allocation of whiting in 1999 was not arbitrary and capricious. Midwater and Oregon appealed.
 
 
 11
 We review the district court's grant of summary judgment de novo. Robi v. Reed, 173 F.3d 736, 739 (9th Cir.1999). Under Section 305(f) of the Magnuson-Stevens Act, 16 U.S.C. § 1855(f), which adopts the standard of review set forth in the Administrative Procedure Act ("APA") at 5 U.S.C. § 706, regulations promulgated by the Secretary may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). Our only task is to determine whether the Secretary has considered the relevant factors and articulated a rational connection between the facts found and the choices made. Wash. Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir.1990).
 
 II
 
 12
 Midwater lacks standing to challenge that portion of the Framework Regulation that identified U & A areas for the Hoh, Quileute, and Quinault Tribes beyond three miles. In order to have standing, a plaintiff must have suffered an "injury in fact" — an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. U.S. v. Hays, 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Although none of the tribes disclaims its right to seek an allocation through the Framework Regulation in the future, the NMFS has not allocated any Pacific whiting to them. Thus, any injury Midwater suffered in connection with the Hoh, Quileute, and Quinault Tribes was "conjectural or hypothetical" rather than "actual or imminent." In short, Midwater has not suffered the requisite injury in fact and lacks standing to challenge the portion of the regulation identifying U & As with respect to the Hoh, Quileute, and Quinault Tribes. Thus, the only tribal allocation properly at issue is that to the Makah Tribe.
 
 III
 
 13
 Midwater argues that tribal treaty rights to Pacific whiting could not be recognized as "applicable law" at the time the 1996 Framework Regulation was adopted, because no express 3623 judicial adjudication of tribal treaty rights to Pacific whiting had been made. Contrary to Midwater's contention, we need not determine tribal fishing rights under the Stevens Treaties on a case by case, "fish by fish," basis. Indeed, to do so would contravene settled law of this circuit and prior Supreme Court determinations. Indeed, we previously rejected this notion in Shellfish II. There, the State of Washington had argued to the district court that the tribes should be required to prove their historic fishing for shellfish. We rebuffed the argument as inconsistent with the language of the Stevens Treaties, the law of the case, and the intent and understanding of the signatory parties. As explained by the district court in Shellfish I and adopted by us in Shellfish II:
 
 
 14
 At [Treaty] time, ... the Tribes had the absolute right to harvest any species they desired, consistent with their aboriginal title.... The fact that some species were not taken before treaty time — either because they were inaccessible or the Indians chose not to take them — does not mean that their right to take such fish was limited. Because the "right of taking fish" must be read as a reservation of the Indians' pre-existing rights, and because the right to take any species, without limit, pre-existed the Stevens Treaties, the Court must read the "right of taking fish" without any species limitation.
 
 
 15
 Shellfish II, 157 F.3d at 644(quoting Shellfish I, 873 F.Supp. at 1430) (ellipses and emphasis in the original).
 
 
 16
 Our reasoning in Shellfish II was a natural outgrowth of the Supreme Court's detailed analysis of tribal fishing rights under the Stevens Treaties in Wash. v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). In that case, the Court concluded:
 
 
 17
 In our view, the purpose and language of the treaties are unambiguous; they secure the Indians' right to take a share of each run of fish that passes through tribal fishing areas.
 
 
 18
 Id. at 679.
 
 
 19
 The fact that we considered tribal rights concerning shellfish specifically in Shellfish II was not incongruous with this treaty interpretation: the Stevens Treaties contained a separate proviso for shellfish, requiring an analysis distinct from that governing free-swimming fish. See Shellfish II, 157 F.3d at 639-40.
 
 
 20
 Pacific whiting are not shellfish. They are free-swimming fish, managed by the NMFS as a unitary stock, that range from the Gulf of California to the Gulf of Alaska. Adult whiting migrate annually from spawning grounds off southern California and northern Mexico to feeding grounds, which range from northern California to British Columbia. They migrate through the Makah Tribe's usual and accustomed fishing grounds. The fact that whiting pass through the U & A in a manner different from anadromous fish, such as salmon, is not relevant. The analysis of the Stevens Treaties conducted in Passenger Fishing Vessel and in Shellfish II applies with equal force to Pacific whiting. The term "fish" as used in the Stevens Treaties encompassed all species of fish, without exclusion and without requiring specific proof. Shellfish II, 157 F.3d at 643 (quoting Shellfish I, 873 F.Supp. at 1430).[4] The district court did not err in so holding.
 
 IV
 
 21
 The Framework Regulation described the U & A fishing grounds for the four tribes as extending to 125 degrees 44' W. longitude, or approximately forty miles off the Washington coast. See 50 C.F.R. § 660.324(c). Although no U & A had been adjudicated beyond three miles for the Hoh, Quileute, and Quinault Tribes, the NMFS extended the Makah Tribe's U & A coordinates south to provide U & As for these other three tribes. 61 Fed.Reg. 28789. The district court did not err in upholding the Secretary of Commerce's recognition of U & A fishing areas beyond the three-mile territorial limit.
 
 
 22
 The Treaty of Neah Bay, which is the applicable treaty with respect to the Makah tribal interests, provides that the fishing rights are "secured to said Indians in common with all citizens of the United States." 12 Stat. 939, art. 4.[5] Nothing in the plain language of the treaty provides a geographic limitation, and longstanding case law establishes that U & A fishing grounds properly extend into waters under United States jurisdiction. See, e.g., Passenger Fishing Vessel, 443 U.S. at 685-87, 99 S.Ct. 3055 (salmon); U.S. v. Wash., 459 F.Supp. 1020, 1065 (W.D.Wash.1978) (herring); Makah v. Brown, No. C85-1606R, and U.S. v. Wash., Civil No. 9213 — Phase I, Subproceeding No. 92-1 (W.D.Wash.), Order on Five Motions Relating to Treaty Halibut Fishing, at 6, Dec. 29, 1993 (halibut); U.S. v. Wash., 873 F.Supp. 1422, 1445 & n. 30 (W.D.Wash.1994), aff'd in part and rev'd in part, 157 F.3d 630, 651-52 (9th Cir.1998) (shellfish); U.S. v. Wash., Subproceeding 96-2 (Order Granting Makah's Motion for Summary Judgment, etc. at 4, Nov. 5, 1996) (Pacific whiting); see also Seufert Bros. Co. v. U.S., 249 U.S. 194, 199, 39 S.Ct. 203, 63 L.Ed. 555 (1919) (rejecting an argument that tribal fishing rights are limited to historic territorial boundaries).
 
 
 23
 Indeed, we have held specifically that the Makah's "historic fishing grounds extend forty miles out to sea. The Makah are guaranteed the right to fish in these grounds by treaty." Makah Indian Tribe v. Verity, 910 F.2d 555, 556 (9th Cir.1990). Thus, the Secretary of Commerce's recognition of U & A fishing areas beyond the three-mile territorial limit was entirely appropriate.
 
 V
 
 24
 After a careful examination of the administrative record, we conclude that the specific allocation in 1999 to the Makah Tribe was inconsistent with the scientific principles set forth in the Magnuson-Stevens Act. Thus, a remand to the NMFS is required.
 
 
 25
 The starting point for any examination of the rightful allocation of Pacific whiting to the Makah Tribe must be the tribe's right under the Treaty of Neah Bay. The Supreme Court provided the analytical framework in Passenger Fishing Vessel:
 
 
 26
 [A]n equitable measure of the common right should initially divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount.
 
 
 27
 443 U.S. at 685, 99 S.Ct. 3055.
 
 
 28
 The concept of "harvestable portion" embraces the "conservation necessity principle," meaning that government regulation must not cause "demonstrable harm to the actual conservation of fish." U.S. v. Wash., 384 F.Supp. 312, 415 (W.D.Wash.1974). Conversely, the conservation necessity principle also permits regulation of marine fisheries as necessary to conserve the fish resource, including regulation of Native American fishers harvesting under treaty rights. Passenger Fishing Vessel Ass'n, 443 U.S. at 682, 99 S.Ct. 3055 ("Although non-treaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation."). In the NMFS allocation context, the conservation necessity principle became incorporated in the description of the available stock for harvesting, namely the "harvestable surplus."
 
 
 29
 Applying these general principles to the case at hand, the Makah Tribe is entitled, pursuant to the Treaty of Neah Bay, to one-half the harvestable surplus of Pacific whiting that passes through its usual and accustomed fishing grounds, or that much of the harvestable surplus as is necessary for tribal subsistence, whichever is less. See Passenger Fishing Vessel Ass'n, 443 U.S. at 685-86, 99 S.Ct. 3055.
 
 
 30
 In making regulatory allocations of fish based on these legal principles, the NMFS is also bound by the requirements of the Magnuson-Stevens Act, which dictates that the NMFS base fishery conservation and management measures on the "best scientific information available." 16 U.S.C. § 1851(a)(2).
 
 
 31
 The immediate origins of the present controversy date to 1996, when the NMFS sought public comment on its initial proposal to determine the Makah allocation based on a "biomass" theory, that is, an estimate of the percentage of Pacific whiting in the Makah's usual and accustomed area. The initial proposal included a multiplier, based on deviations from average harvest rates in prior years. Under the proposal, the Makah allocation was estimated to be 6.5% of the harvest available to all United States fishermen, or approximately 13,000 to 18,000 metric tons.
 
 
 32
 The Makah Tribe argued that the NMFS should employ a harvest-based approach, under which it would be entitled to half the whiting harvested in the North Columbia/Vancouver area, or 25% of the total United States harvest. This contention was based on the Makah Tribe's assertion that the majority of the unitary stock of whiting pass through the Makah Tribe's usual and accustomed area. Therefore, it reasoned, it was entitled to up to 50% of all whiting on the Pacific coast.
 
 
 33
 The NMFS never implemented the bio-mass-based methodology it had proposed, in part because that methodology had been rejected in United States v. Washington, which involved allocation of halibut, as contrary to the conservation necessity principle. The NMFS was apparently also concerned about legal proceedings that the tribe had instituted. Instead, the NMFS and the Makah Tribe entered into a compromise agreement, under which the Tribe was to be allocated 15,000 metric tons in 1996. 61 Fed.Reg. 28787.
 
 
 34
 Subsequently, the tribe proposed a two-year interim allocation of 10.8% of the United States Harvest Guidelines for 1997 and 1998. After determining that the proposal would have a negligible biological impact, the NMFS approved the proposal.
 
 
 35
 In 1998, the Makah Tribe made a five-year compromise proposal to the NMFS, under which the tribe would receive a treaty share not to exceed 17.5% of the United States harvest guideline in any one year. In 1999, the NMFS proposed an allocation to the Makah Tribe, in accordance with the compromise agreement, of 32,500 metric tons, or 14% of the estimated total United States harvest. Subsequently, the NMFS published a proposed rule requesting comments on (1) the Makah Tribe's sliding-scale proposal, which under the 1999 United States Harvest Guidelines would result in an allocation of 32,500 metric tons or 14% of the total United States harvest; (2) a "status quo" allocation of 25,000 metric tons. 64 Fed.Reg. 1341, 1341-42. In an environmental assessment prepared for the 1999 tribal allocation, the NMFS concluded that the Makah proposal would have no significant impact on the environment. 64 Fed.Reg. 27928, 27933. In the end, the NMFS approved the Makah proposal. Id. at 27930. In doing so, the agency stated:
 
 
 36
 The Makah have made a proposal for 32,500 mt of whiting in 1999 that NMFS accepts as a reasonable accommodation of the treaty right for 1999 in view of the remaining uncertainty surrounding the appropriate quantification. This 1999 amount of 32,500 mt (14 percent of the 232,000-mt OY) is not intended to set a precedent regarding either quantification of the Makah treaty right or future allocations. NMFS will continue to attempt to negotiate a settlement in U.S. v. Washington regarding the appropriate quantification of the treaty right to whiting. If an appropriate methodology or allocation cannot be developed through negotiations, the allocation will ultimately be resolved in the pending subproceeding in U.S. v. Washington.
 
 
 37
 
 Id.
 
 
 
 38
 The difficulty with the published justification for the rule is, of course, that it is devoid of any stated scientific rationale. The Magnuson-Stevens Act requires the Secretary to describe the "nature and extent" of the tribal fishing right, 16 U.S.C. § 1853(a)(2), based on the "best scientific information available." 16 U.S.C. § 1851(a)(2). In sum, the best available politics does not equate to the best available science as required by the Act.
 
 
 39
 An agency's action is "normally" considered arbitrary and capricious when it:
 
 
 40
 has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
 
 
 41
 Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Indeed, in our review of agency action under FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), our first inquiry is "`whether Congress has directly spoken to the precise question at issue.'" Id. at 132, 120 S.Ct. 1291(quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). If the answer is affirmative, "the inquiry is at an end; the court `must give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778). In examining the Magnuson-Stevens Act, there is little doubt of congressional intent: the agency was directed to employ the "best available scientific information" as its methodology in making its decisions.
 
 
 42
 A plain reading of the proposed NMFS rule, and the undisputed history leading up to the allocation decision, demonstrate that the rule was a product of pure political compromise, not reasoned scientific endeavor. Although the NMFS allocation may well be eminently fair, the Act requires that it be founded on science and law, not pure diplomacy.
 
 
 43
 For these reasons, a remand to the NMFS is required to either promulgate a new allocation consistent with the law and based on the best available science, or to provide further justification for the current allocation that conforms to the; requirements of the Magnuson-Stevens Act and the Treaty of Neah Bay.
 
 
 44
 AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
 
 
 45
 Opinion by Judge THOMAS.
 
 
 
 Notes:
 
 
 [1]
 See, e.g., Treaty of Medicine Creek, 10 Stat. 1132 (Dec. 26, 1854); Treaty of Point Elliot, 12 Stat. 927 (Jan. 22, 1855); Treaty of Point No Point, 12 Stat. 933 (Jan. 26, 1855); Treaty of Neah Bay, 12 Stat. 939 (Jan. 31, 1855); Treaty with the Yakamas, 12 Stat. 951 (June 9, 1855); Treaty of Olympia, 12 Stat. 971 (July 1, 1855). See generally Wash. v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 661-69, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Affected Indian tribes include the following: Hoh; Lower Elwha Band of Clallam Indians; Lummi; Makah; Muckleshoot; Nisqually; Nooksack; Port Gamble Band of Clallam Indians; Puyallup; Quileute; Quinault; Sauk Suiattle; Skokomish; Squaxin Island; Stillaguamish; Suquamish; Swinomish; Tulalip; Upper Skagit; and Yakama.
 
 
 [2]
 The precise language at issue inShellfish II was the "right of taking fish, at all usual and accustomed grounds and stations ... in common with all citizens of the Territory ...." Shellfish II, 157 F.3d at 638 (emphasis supplied).
 
 
 [3]
 The district court's opinion in the same case,U.S. v. Wash., 873 F.Supp. 1422 (W.D.Wash.1994), has generally been referred to as "Shellfish I."
 
 
 [4]
 In addition, we note that the Makah Tribe submitted undisputed evidence supporting the conclusion that they harvested Pacific whiting at treaty time. 61 Fed.Reg. 28786; 28788 (June 6, 1996)
 
 
 [5]
 As noted earlier, some of the other Stevens Treaties employed the more restrictive phrase "in common with all citizens of the Territory."See, e.g., Treaty of Olympia, 12 Stat. 971, art. III (July 1, 1855); Passenger Fishing Vessel, 443 U.S. at 662, 99 S.Ct. 3055. Thus, Midwater's argument that the Makah's rights are confined to the territorial rights of the citizens of the State of Washington lacks even a textual basis in this case.