**MIDWATER TRAWLERS CO–OPERATIVE; West Coast Seafood Processors; Fisherman's Marketing Association, Plaintiffs–Appellants,**

and

**State of Oregon; State of Washington, Plaintiffs,**

v.

**DEPARTMENT OF COMMERCE; National Marine Fisheries Service; Mickey Kantor, Secretary, U.S. Dept of Commerce; William M. Daley, Secretary of Commerce; Penelope D. Dalton, Asst Administrator for Fisheries, National Oceanic and Atmospheric Admin; Director, National Marine Fisheries Svc; William Stelle, Jr., Director, National Marine Fisheries Svc, Defendants–Appellees,**

**Makah Indian Tribe, Defendant–intervenor–Appellant.**

No. 03–35398.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2004.

Filed Dec. 28, 2004.

James P. Walsh, Davis, Wright, Tremaine, LLP, San Francisco, California, for the plaintiffs-appellants.

Thomas L. Sansonetti, Assistant Attorney General, and Robert L. Gulley, Peter C. Monson, and James C. Kilbourne, U.S. Department of Justice, Environmental and Natural Resources Division, Washington, D.C., for the federal defendants-appellees.

Eileen M. Cooney, Elizabeth R. Mitchell, Office of General Counsel, National Oceanic and Atmospheric Administration, Seattle, Washington, of counsel for the federal defendants-appellees.

Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for defendant-intervenor-appellee Makah Indian Tribe.

Before: PREGERSON, FERGUSON, and CALLAHAN, Circuit Judges.

PREGERSON, Circuit Judge:

Midwater Trawlers Cooperative, West Coast Seafood Processors, and the Fishermen's Marketing Association (collectively "Appellants" or "Midwater") challenge the Secretary of Commerce's decision to allocate a portion of the U.S. harvest of Pacific whiting[1] to the Makah Indian Tribe ("the Makah Tribe"). Appellants argue that the allocation runs afoul of the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. § 1801 et seq., and the Administrative Procedure Act ("APA"). In an earlier appeal in this case, we concluded that the National Marine Fisheries Service ("Fisheries Service")[2] had failed to explain its allocation of Pacific whiting to the Makah Tribe using the best available scientific information. Accordingly, we remanded for the Fisheries Service to promulgate

a new allocation to the Makah Tribe consistent with the law and based on the best available science, or to provide further justification that the current allocation conforms to the requirements of the Magnuson–Stevens Act and the 1855 Treaty of Neah Bay.[3] *Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F.3d 710 (9th Cir. 2002) (*Midwater II*).

Following remand, the district court granted summary judgment in favor of the Department of Commerce, the Fisheries Service, and the National Oceanic and Atmospheric Administration (collectively "Appellees"). In so doing, the district court denied Appellants' request to remand to the Fisheries Service for further rulemaking proceedings to clarify the basis of the "sliding scale" method of Pacific whiting allocation. Instead, the district court approved the sliding scale method. Appellants argue (1) that the district court should have vacated the challenged regulation and remanded to the Fisheries Service, and (2) that the sliding scale method of allocation is not based on the "best available scientific evidence" as required by the Magnuson–Stevens Act. We affirm the district court's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

This appeal arises out of a series of four consolidated suits challenging the Secretary of Commerce's decisions to allocate a portion of the U.S. harvest of Pacific coast whiting to the Makah Tribe under the Treaty of Neah Bay. The controversy began in 1995, after the Makah Tribe notified

1. Pacific whiting are members of the cod family.

2. The Fisheries Service is a subagency of the Department of Commerce.

3. The Treaty of Neah Bay is one of ten treaties (referred to as the Stevens Treaties) that the United States entered into in the 1850s. The treaties recognize tribal fishing rights in the tribes' "usual and accustomed" fishing areas. *See United States v. Washington*, 384 F.Supp. 312, 349 (W.D.Wash.1974) (*Washington I*).

the Fisheries Service that it intended to exercise its treaty rights and harvest up to one half of the harvestable surplus of Pacific whiting that pass through its usual and accustomed fishing grounds.[4] *See generally Washington v. Daley,* 173 F.3d 1158, 1162 (9th Cir.1999).[5]

Allocation of Pacific whiting is subject to regulation pursuant to the Magnuson–Stevens Act, 16 U.S.C. § 1801 et seq., which vests the Fisheries Service with the authority to issue fishery management regulations.[6] *See* 16 U.S.C. §§ 1853, 1855; *see also Kramer v. Mosbacher,* 878 F.2d 134, 135 (4th Cir.1989). Such regulations must be consistent with the Magnuson–Stevens Act and other applicable law defining Indian treaty fishing rights. *See Parravano v. Babbitt,* 70 F.3d 539, 544 (9th Cir.1995). "Other applicable law" under the Magnuson–Stevens Act includes Indian treaty fishing rights. *Wash. State Charterboat Ass'n v. Baldrige,* 702 F.2d 820, 823 (9th Cir.1983).

In 1996, the Fisheries Service promulgated a "Framework Regulation," codified at 50 C.F.R. § 660.324, that recognized the treaty rights of four coastal tribes—the Hoh, Makah, and Quileute Indian Tribes, and the Quinault Indian Nation—to harvest groundfish [7] in the tribes' "usual and accustomed" fishing areas. 61 Fed.Reg. 28786 (June 6, 1996); 50 C.F.R. § 660.324. The Framework Regulation defined the usual and accustomed fishing areas of the four tribes as extending approximately forty miles into the ocean off Washington's coast. *Daley,* 173 F.3d at 1162. It also instituted a procedure for accommodating these treaty rights. *Id.*

Pursuant to the Framework Regulation, the Department of Commerce has made allocations of Pacific whiting to the Makah Tribe every year since 1996. In 1996, Midwater, along with the states of Oregon and Washington, filed suit against Appellees, challenging the Framework Regulation and the allocation provided to the tribes. In addition, because it believed the Fisheries Service's proposed allocation de-

---

**4.** "The harvestable surplus of whiting is defined as the total number of fish that may be taken while observing all conservation needs that prevent demonstrable harm to the stock, and treaty harvest is limited only by this conservation principle." *United States v. Washington,* 143 F.Supp.2d 1218, 1221–22 (W.D.Wash.2001) *(Washington II).*

**5.** In an earlier order in the 1996 cases, the district court dismissed Midwater's Magnuson Act claims for failure to join the tribes as necessary and indispensable parties, and granted summary judgment against plaintiffs on their claims under the Endangered Species Act and the Regulatory Flexibility Act. We reversed the dismissal of the Magnuson Act claims and affirmed the grant of summary judgment on all other claims. *See Daley,* 173 F.3d 1158.

**6.** More specifically,

> The Magnuson Act provides for a system of Regional Fishery Management Councils, each of which "prepare[s] and submit[s] to the Secretary of Commerce a fishery management plan (FMP) with respect to each fishery within its geographical area of authority." The Secretary, acting through the[Fisheries Service], reviews the plans and amendments to the plans for consistency with national standards and "other applicable law." Assuming that the plan meets these criteria, the Secretary publishes notice of the plan or amendment in the Federal Register and promulgates regulations implementing the plan after the statutory comment period. The Secretary may independently prepare a plan only if the Regional Management Council has failed to do so within a reasonable time or if the Secretary disapproves a submitted plan and the submitting council fails to submit a revised version.

> *Daley,* 173 F.3d at 1162 (internal citations omitted).

**7.** "Groundfish" describes fish that live at the bottom of a body of water.

prived it of its treaty entitlement in violation of its treaty rights, the Makah Tribe initiated a subproceeding seeking to have the proposal declared invalid.[8] *Washington II*, 143 F.Supp.2d at 1221.

In its subproceeding, the Makah Tribe disagreed with the Fisheries Service over the method to be used for calculating the tribe's allocation of Pacific whiting. The Makah Tribe argued that the biomass method lacked scientific support and disagreed with the Fisheries Service on the definition of "harvestable surplus." *See, e.g., Washington II*, 143 F.Supp.2d at 1221.

Under the biomass methodology initially used by the Fisheries Service, "the amount of harvestable fish is calculated by taking snapshots of the geographic distribution of Pacific whiting at given points in time." *Id.* at 1223. The problem with the biomass method is that it fails to account for the annual migration patterns of Pacific whiting, which can be influenced by ocean conditions, age, and food sources. This means that the abundance of Pacific whiting in a particular area may dramatically differ from day-to-day as the fish migrate for food or because of ocean conditions. Consequently, the biomass's snapshot method will only count those fish present in the Makah Tribe's usual and accustomed fishing grounds during the particular survey period, likely resulting in an underestimate of the actual numbers of Pacific whiting passing through those fishing grounds.

Instead of a biomass methodology, the Makah Tribe had long argued that a sliding scale methodology provided a better way to calculate its treaty share of the annual Pacific whiting harvest. Under the sliding scale method, the amount of Pacific whiting allocated to the tribes varied, based on the amount of U.S. Optimum Yield.[9] The data supporting this approach indicates that the "bulk" of migratory Pacific whiting pass through the Makah Tribe's usual and accustomed fishing grounds, thereby entitling the Makah Tribe to fifty percent of the bulk of the migratory Pacific whiting harvest. *Midwater II*, 282 F.3d at 719. When estimates of the Optimum Yield are less than 145,000 metric tons ("mt"), the Makah Tribe would be allocated 17.5 percent of the Optimum Yield. After the estimate reached 250,000 mt, the tribe's portion would remain at 35,000 mt.

Before making the 1999 Pacific whiting allocation, the Fisheries Service sought public comment on two allocation proposals. One proposal would have kept the tribe's 1999 allocation the same as it had been for 1997 and 1998. The other proposal would have relied upon the sliding scale methodology proposed by Makah, which varied the tribe's allocation as a percentage of the U.S. Optimal Yield. 64 Fed.Reg. 1341 (Jan. 8, 1999). However, the Fisheries Service later determined that the tribe's proposal of 32,500 mt was a "reasonable accommodation of the treaty right for 1999 in view of the remaining uncertainty surrounding the appropriate quantification." 64 Fed.Reg. 27928 (May 24, 1999).

In response to the Fisheries Service's 1999 Pacific whiting allocation, Midwater and Oregon filed a second suit in the U.S.

---

8. Makah also sought to have the biomass methodology the Fisheries Service proposed using in 1995 declared unlawful. However, because the Fisheries Service never implemented the biomass methodology, the district court refused to take up the issue whether this method was "unlaw-ful."

9. "Optimum yield" under the statute is defined as the "maximum sustainable yield from the fishery." 16 U.S.C. § 1802(28)(B).

District Court in Oregon, again challenging the agency's allocation of Pacific whiting to Makah. This case was consolidated with Midwater's 1996 suit in the U.S. District Court for the Western District of Washington.

In its second suit, Midwater argued, among other things, that the 1999 Pacific whiting allocation was illegal because it was not based on the "best scientific information available." The district court granted Appellees' motion for summary judgment on all of Midwater's claims, upholding the 1996 Framework Regulation and the 1999 allocation. *Midwater Trawlers Coop. v. Dep't of Commerce*, 139 F.Supp.2d 1136, 1148 (W.D.Wash.2000).

On appeal from that decision, we upheld the Framework Regulation that recognized and implemented the treaty rights of the four coastal tribes to harvest groundfish in their usual and accustomed fishing grounds. *Midwater II*, 282 F.3d at 719 (holding that the Makah Tribe is "entitled, pursuant to the Treaty of Neah Bay, to one half the harvestable surplus of Pacific whiting that passes through its usual and accustomed fishing grounds, or that much of the harvestable surplus as is necessary for tribal subsistence, whichever is less"). However, we further concluded that the 1999 allocation of Pacific whiting to the Makah Tribe did not comply with the Magnuson–Stevens Act because the Fisheries Service failed to explain the allocation on the basis of the best available scientific information. *Id.* at 719–20 ("[T]he undisputed history leading up to the allocation decision, demonstrates that the rule was a product of pure political compromise, not reasoned scientific endeavor. Although the Fisheries Service's allocation may well be eminently fair, the Act requires that it be founded on science and law, not pure diplomacy."). Accordingly, we remanded to the district court for the Fisheries Ser-

vice "to either promulgate a new allocation consistent with the law and based on the best available science, or to provide further justification for the current allocation that conforms to the requirements of the Magnuson–Stevens Act and the Treaty of Neah Bay." *Id.* at 721.

Eventually, the Fisheries Service agreed with the Makah Tribe that a sliding scale methodology was consistent with applicable law and treaty obligations. Nevertheless, the State of Oregon separately sought summary judgment to determine that the biomass allocation was the proper methodology. *Washington II*, 143 F.Supp.2d at 1221–22. The district court issued its ruling on the merits of the "sliding scale" methodology used in the 1999 allocation, while the *Midwater II* appeal was pending with this court. *Id.* at 1223. In its order, the district court observed that the biomass method was likely to underestimate the amount of harvestable fish passing through the tribe's usual and accustomed fishing grounds. *Id.* at 1223–24. In addition, the district court noted that this method "was not internationally recognized as the best measure for allocating marine fishery resources." *Id.* Rather, the sliding scale method was consistent with the Magnuson–Stevens Act's requirements and it "embodie[d] [the Fisheries Service] reasoned opinion on how to best manage the nation's fisheries resources while honoring the country's treaty commitments." *Id.* at 1224. Thus, the district court rejected the biomass method and held that the sliding scale method "shall govern the United States aspect of the Pacific whiting fishery until the Secretary finds just cause for alteration or abandonment of the plan, the parties agree to a permissible alternative, or [until] further order issues from this court." *Id.*

Following our remand in *Midwater II*, the Fisheries Service issued its 2002 Pacif-

ic whiting allocation. 67 Fed.Reg. 18,117; 18,128–29 (Apr. 15, 2002). In that allocation, the Fisheries Service explained,

> [T]he Fisheries Service has reviewed the best available scientific information, including the information contained in documents in the administrative record in the *Midwater Trawlers* case, and has also reviewed scientific information submitted by [the Fisheries Service] and the Makah Tribe in [*United States*] v. *Washington*, Sub-proceeding 96–2. [The Fisheries Service] has no additional information that alters the existing information on the distribution and migration pattern of the stock. Therefore, the Fisheries Service is relying on the existing information as the best scientific information available.

67 Fed.Reg. at 18,120; *see also id.* ("[The Fisheries Service] is relying on the existing information as the best scientific information available.").

Additionally, in January 2003, the Fisheries Service sought public comment on its proposed rule to allocate Makah Tribe's treaty share using the sliding scale method. 68 Fed.Reg. 936, 984–85 (Jan. 7, 2003). In March 2003, the Fisheries Service issued its final rules establishing the 2003 allocations of Pacific whiting. *See* 68 Fed.Reg. 11,182, 11,228–30 (Mar. 7, 2003). In so doing, the Fisheries Service stated that the allocations were based on the "best scientific information currently available." 68 Fed.Reg. at 11,228. Again, the Fisheries Service explained that it had

> no additional information that would change the conclusions in th e[declarations of William L. Robinson and Dr. Richard D. Methot, Jr., submitted in *Midwater Trawlers Cooperative v. Department of Commerce*] on the distribution and migratory pattern of the [Pacific whiting] stock. Therefore, [the Fisheries Service] is relying on the in-

formation in those declarations as the best scientific information currently available. Accordingly, the Fisheries Service finds that the 2003 treaty Indian allocation of Pacific whiting (25,000 mt to be taken by the Makah Tribe), which is based on the sliding scale methodology that has been in use since 1999, is based on the best scientific information available, and is within the Indian treaty right as described in *Midwater Trawlers Cooperative v. Department of Commerce*, 282 F.3d 710, 718 (9th Cir.2002).

*Id.* The Fisheries Service went on to reject the biomass methodology, explaining that,

> the biomass method is not required for conservation and underestimates the quantity of fish that pass through the tribal usual and accustomed fishing grounds, and hence it cannot serve as the basis for calculating the treaty share. Also, application of the biomass method to calculate the treaty Indian allocation of Pacific whiting would illegally discriminate against tribal fishing interests, since the biomass method is not used in management of the nontreaty fishery. *Id.; also see Makah v. Brown*, C85–1606R, Order on Five Motions Relating to Treaty Halibut Fishing at 6 (W.D.Wash.1993).

*Id.*

After the Fisheries Service issued its 2002 allocation, Midwater sought an order from the district court directing the Fisheries Service to conduct new rulemaking and to enjoin the use of the sliding scale methodology until such rulemaking was complete. In response, the Fisheries Service argued that remand was unnecessary. Rather, the Fisheries Service moved to supplement the administrative record with additional explanation for the scientific foundation underlying the use of the sliding scale methodology in the 1999 alloca-

tion. As part of its motion, the Fisheries Service included the declarations of William Robinson, Assistant Regional Manager for Sustainable Fisheries, and Richard Methot, the Fisheries Service's Senior Advisor on Groundfish Issues. Both declarations concluded that the available scientific information supported the sliding scale methodology adopted by the Fisheries Service.

The district court, in an order directly relevant to this appeal, granted the Fisheries Service's motion to supplement the administrative record and granted summary judgment in favor of the Appellees. In so ruling, the district court denied Midwater's request to remand to the Fisheries Service for further rulemaking proceedings to clarify the basis of the "sliding scale" method of allocating Pacific whiting. Instead, the district court concluded that the sliding scale method met the requirements of the Magnuson–Stevens Act.

According to the district court, the biomass method was not based on the best scientific information available. Rather, the best available scientific information supported the sliding scale method. That information established that most Pacific whiting pass through the Makah Tribe's usual and accustomed fishing grounds. In making the 2002 and 2003 allocations, the Fisheries Service relied on the sliding scale methodology after finding no additional information to change its scientific conclusions regarding Pacific whiting migration patterns. Because no additional information had come to light, the sliding scale methodology remained the "best scientific information available." Therefore, the district court concluded, "a sliding scale methodology, which allocates the Makah Tribe's rights on the basis of the entire U.S. yield, is based on the best scientific information available despite potential gaps and imperfections in the infor-

mation," and remand to the Fisheries Service was not necessary.

In this appeal, Midwater argues that the sliding scale method of allocation is not based on the "best available scientific evidence" as required by the Magnuson–Stevens Act. Midwater further contends that the district court should have vacated the challenged regulation and remanded to the Fisheries Service.

## STANDARD OF REVIEW

■ We have jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291. The district court's order granting or denying summary judgment is reviewed de novo. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir.2004). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The district court's decision to supplement the record is reviewed for an abuse of discretion. *See Fishing Co. of Alaska, Inc. v. United States*, 333 F.3d 1045, 1046 (9th Cir.2003).

■ Under section 305(f) of the Magnuson–Stevens Act, 16 U.S.C. § 1855(f), which adopts the standard of review set forth in the APA at 5 U.S.C. § 706, regulations promulgated by the Commerce Secretary may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard is narrow, and we may not substitute our judgment for that of the agency." *Daley*, 173 F.3d at 1169. Rather, in reviewing such regulations, our only task is to determine whether the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and

the choices made." *Id.* (quoting *Wash. Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1441 (9th Cir.1990)).

## DISCUSSION

### 1. The Best Scientific Information Available

█ The Magnuson–Stevens Act requires that allocations between treaty and nontreaty fishers be based on the "best scientific information available." 16 U.S.C. § 1851(a)(2) ("Conservation and management measures shall be based upon the best scientific information available."); *see also Parravano v. Babbitt,* 837 F.Supp. 1034, 1046 (N.D.Cal.1993), *aff'd,* 70 F.3d 539, 542–43 (9th Cir.1995). Nevertheless, "[t]he fact that scientific information concerning a fishery is incomplete does not prevent [regulation]." 50 C.F.R. § 600.315(b). Indeed, by specifying that decisions be based on the best scientific information *available,* the Magnuson–Stevens Act recognizes that such information may not be exact or totally complete. *See, e.g., Wash. Crab Producers,* 924 F.2d at 1448–49.

█ In allocating fish between treaty and nontreaty fishers, the location of where the fish are caught does not matter. *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 687, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("Shares in the fish runs should not be affected by the place where the fish are taken."). Rather, "any fish (1) taken in Washington waters or in United States waters off the coast of Washington, (2) taken from runs of fish that pass through the Indians' usual and accustomed fishing grounds, and (3) taken by either members of the Indian tribes that are parties to this litigation, on the one hand, or by non-Indian citizens of Washington, on the other hand, shall count against that party's re-spective share of the fish." *Id.* at 689, 99 S.Ct. 3055. As we have already found, the Makah Tribe is entitled to one half of the Pacific whiting passing through its usual and accustomed fishing grounds. *Midwater II,* 282 F.3d at 719.

█ Here, the primary dispute is the method to be used to determine the amount of Pacific whiting that passes through the Makah Tribe's usual and accustomed fishing grounds. Specifically, Midwater challenges the Fisheries Service decision to base the Makah Tribe's annual allocation on the sliding scale methodology proposed by the tribe. Midwater argues that the method is the result of political compromise instead of scientific data. We conclude, however, that, although the Fisheries Service's initial adoption of the sliding scale method may have been the result of a compromise, the Fisheries Service has amply demonstrated that it is the method supported by the best available scientific information.

As discussed above, the Fisheries Service initially believed that the biomass method was the best way to determine the tribe's allocation of Pacific whiting. 61 Fed.Reg. 10303, 10305 (Mar. 13, 1996). Nevertheless, the Fisheries Service also recognized that the biomass method had been rejected as contrary to the conservation necessity principle. Further, the Fisheries Service data regarding the Pacific whiting's migratory pattern contradicted the biomass method's snapshot calculation of the numbers of fish potentially exploitable by Makah.

In contrast to the picture painted by the biomass method's snapshot approach, the Fisheries Service's data suggests that the Pacific whiting's migration pattern takes the bulk of the Pacific whiting stock through the Makah Tribe's usual and accustomed fishing grounds. According to declarations by the Fisheries Service's sci-

entists, available data suggests that when Pacific whiting migrate north, their migrations take place within Makah Tribe's usual and accustomed fishing grounds such that the bulk of Pacific whiting stock pass through the tribe's usual and accustomed fishing grounds. Recognition of this migration pattern is significant because it means that all migrating coastal Pacific whiting are potentially exploitable by Makah. Simply put, the biomass method's "snapshot" approach fails to account for this migratory pattern and, thereby underestimates the numbers of fish passing through the tribe's fishing grounds.[10]

The sliding scale method, however, does account for the Pacific whiting's migratory patterns and, thus, overcomes the failings of the biomass approach. Under the sliding scale method, the Makah Tribe would be allocated a percentage ranging from 14 and 17.5 percent of the U.S. Optimum Yield.[11]

"Optimum yield" is defined as the "maximum sustainable yield from the fishery." 16 U.S.C. § 1802(28)(B). By relying on the Optimum Yield, the sliding scale method presumes that the bulk of Pacific whiting passes through and is exploitable by Makah. This presumption is supported by the Fisheries Service's data concerning migration patterns. Thus far, the Fisheries Service has found no new information contradicting its data concerning Pacific whiting migratory patterns or distribution. *See* 68 Fed.Reg. at 11,228.

Because the "best available scientific information" supports a sliding scale method of allocation, we find that the Fisheries Service's reliance on that method for allocating the tribal share of the Pacific whiting harvest is neither arbitrary, capricious, nor an abuse of its discretion. 16 U.S.C. § 1855(f); 5 U.S.C. § 706(2)(A); *Daley*, 173 F.3d at 1169. We agree with the

---

**10.** Midwater's argument that the district court failed to explain why the biomass method resulted in inaccurate counts is without merit. In its order, the district court explained that the biomass method failed to account for the transitory migration patterns of whiting. By failing to take the whiting's particular migratory pattern into account, the biomass method of estimating the number of whiting passing through the Makah's fishing grounds—i.e., a snapshot limited to a specific day and time—would fail to capture the complete numbers of fish passing through that area.

**11.** Because the Pacific whiting's migratory pattern takes it through the Makah Tribe's usual and accustomed fishing grounds, Makah is entitled to fifty percent of all migrating coastal whiting. *See Midwater II*, 282 F.3d at 719 (concluding that Makah are "entitled, pursuant to the Treaty of Neah Bay, to one half the harvestable surplus of Pacific whiting that passes through its usual and accustomed fishing grounds"). Under the sliding scale method, Makah would be allocated a percentage ranging from 14 and 17.5 percent of the U.S. Optimum Yield.

Midwater argues, however, that Fisheries Service has failed to explain the scientific basis for the 14 and 17.5 percent ranges in the sliding scale method. According to Midwater, Fisheries Service cannot support these percentages using the best scientific information available. Contrary to Midwater's argument, Fisheries Service is not required to establish that these percentages are supported by the best scientific information available. We have previously concluded that Makah's treaty rights entitle it to *50 percent* "of the harvestable surplus of Pacific whiting that passes through its usual and accustomed fishing grounds, or that much of the harvestable surplus as is necessary for tribal subsistence, whichever is less." *Midwater II*, 282 F.3d at 719. Nothing, however, supports the notion that a tribe is obligated to take its full 50 percent entitlement. That the tribe opts to not take its full treaty share does not put Fisheries Service in the position of justifying a tribe's lower allocation request. Rather, Fisheries Service is required only to support its decision to use the U.S. Optimum Yield as the basis from which to measure the tribe's allocation. And, we conclude that Fisheries Service has met this obligation.

district court that "a sliding scale methodology, which allocates the Makah Tribe's rights on the basis of the entire U.S. yield, is based on the best scientific information available despite potential gaps and imperfections in the information."

## 2. Remand to the Fisheries Service Was Not Necessary

In *Midwater II*, we remanded to the Fisheries Service for the agency "to promulgate a new allocation consistent with the law and based on the best available science, *or* to provide further justification for the current allocation that conforms to the requirements of the Magnuson–Stevens Act and the Treaty of Neah Bay." *Midwater II*, 282 F.3d at 721 (emphasis added). Midwater argues that the district court should have vacated the challenged regulation and remanded to the Fisheries Service for public rulemaking proceedings consistent with the Magnuson–Stevens Act and the APA.[12]

## A. APA's Notice & Comment Requirements

Under the APA, the Fisheries Service must provide notice of proposed rulemaking in the Federal Register and allow a thirty day comment period. 5 U.S.C. § 553. Such notice "shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) refer-

ence to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).

■ Midwater suggests that the Fisheries Service failed to engage in a public comment period as required by the APA. However, even before Midwater moved the district court to remand to the Fisheries Service, the agency had already conducted a new rulemaking for the 2002 allocation. *See* 67 Fed.Reg. 18,117, 18,-128–29 (Apr. 15, 2002). This rulemaking provided for a thirty-day comment period. 67 Fed.Reg. 18,117. In making the 2002 allocation to the Makah Tribe, the Fisheries Service expressly referred to the administrative record and court proceedings and explained that it had reviewed and was relying upon the best available scientific information regarding the distribution and migration pattern of Pacific whiting. *See id.* at 18,120 ("[The Fisheries Service] is relying on the existing information as the best scientific information available.").

Moreover, before the district court ruled on the cross-motions for summary judgment, the Fisheries Service again instituted a new rulemaking procedure and sought public comment on its proposed 2003 rule to allocate the Makah Tribe's treaty share using the sliding scale method. 68 Fed.Reg. 936, 984–85 (Jan. 7,

---

**12.** Midwater also argues that the district court should have remanded so that the Fisheries Service could "conduct a new rulemaking that fully explained the scientific basis for changing its scientific position...." However, nothing in the remand order suggests that the Fisheries Service was required to explain its rejection of the biomass method in favor of the sliding scale methodology it ultimately adopted. Moreover, this argument ignores the fact that in its 2003 allocation, the Fisheries Service *did* explain its rejection of the biomass methodology. *See* 68 Fed.Reg. at 11,228 ("[T]he biomass method is not re-

quired for conservation and underestimates the quantity of fish that pass through the tribal usual and accustomed fishing grounds, and hence it cannot serve as the basis for calculating the treaty share. Also, application of the biomass method to calculate the treaty Indian allocation of Pacific whiting would illegally discriminate against tribal fishing interests, since the biomass method is not used in management of the non-treaty fishery. *Id.; see also Makah v. Brown*, C85–1606R, Order on Five Motions Relating to Treaty Halibut Fishing at 6 (W.D.Wash.1993).").

2003). Two months later, the Fisheries Service issued its final rules establishing the 2003 allocations of Pacific whiting. *See* 68 Fed.Reg. 11,182; 11,228–30 (Mar. 7, 2003). In so doing, the Fisheries Service again referred to the administrative record and court records in the consolidated challenges to the Pacific whiting allocations and declared that the allocations were based on the "best scientific information currently available." 68 Fed.Reg. at 11,-228 (finding "that the 2003 treaty Indian allocation of Pacific whiting[,] ... based on the sliding scale methodology that has been in use since 1999, is based on the best scientific information available, and is within the Indian treaty right[s] as described in *Midwater Trawlers Co-operative v. Department of Commerce*, 282 F.3d 710, 718 (9th Cir.2002).").

Midwater, however, argues that both the Fisheries Service's 2002 and 2003 Federal Register notices failed to "cogently explain why the allocation satisfies the Magnuson–Stevens Act." In particular, Midwater complains that "[the Fisheries Service] has failed to explain exactly why a particular fixed (but sliding) percentage of the overall U.S. harvest of Pacific whiting reasonably reflects the amount of Pacific whiting that is 'harvestable' in tribal [usual and accustomed fishing areas]."

Midwater correctly notes that we have previously confirmed that the Fisheries Service is obligated to comply with the notice and comment provisions of the APA. *See NRDC v. Evans*, 316 F.3d 904, 910 (9th Cir.2003). However, *Evans* did not address the contours of the notice requirement, only that the Fisheries Service must comply and that it must engage in context-specific analysis when seeking a good cause exception to the APA's notice requirement. *See id.* at 911–12. The Fisheries Service is not seeking such an exception here, making *Evans* little help to Midwater.[13]

More important, and contrary to Midwater's argument, the Supreme Court has held that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). In so holding, the Court rejected the argument that an agency's action was arbitrary and capricious because it did not apprise the plaintiff "of the material on which it [would] base its decision, ... [ ]or provide[ ] [the plaintiff with] a statement showing its reasoning in applying those standards." *Id.* at 653, 110 S.Ct. 2668 (quoting 875 F.2d 1008, 1021). Because the APA does not impose such notice requirements, "[a] failure to provide them where the Due Process Clause itself does not require them (which has not been asserted here) is therefore not unlawful." *Id.* at 655–56. Rather, an agency is required to "take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of the decision." *Id.* at 654. Importantly, however, the Court did not find that such an explanation must be provided in the agency's Federal Register notice. *See id.*

Finally, although *Mount Diablo Hospital v. Shalala*, 3 F.3d 1226 (9th Cir.1993), noted that a rule may be invalidated where the agency fails to adequately explain the

---

**13.** Likewise, Midwater's citation to *NRDC v. Daley* is inapposite as that case did not even address the Fisheries Service's notice or comment requirements under the APA. *See* 209 F.3d 747 (D.C.Cir.2000).

rule, that case dealt with whether an agency was required to provide an explanation responsive to every comment made during the comment period. *Id.* at 1233–34. On this point, we concluded that "[t]he agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did." *Id.* at 1234 (quoting *South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 886 (4th Cir.1983)). We further noted, however, that "[i]n making the'keystone' inquiry whether the Secretary 'engaged in reasoned decision-making,' the reviewing court is to consider the larger administrative record." *Id.* (internal citations omitted). This latter conclusion makes clear that the rationale for the agency decision can be located outside the Federal Register notice.

Because the Fisheries Service conducted two new rulemakings, both of which sought public comment, we conclude that it complied with the APA's notice requirements and with *Midwater II's* remand order that the agency "promulgate a new allocation consistent with the law and based on the best available science." *Midwater II,* 282 F.3d at 721. Accordingly, remand to the Fisheries Service was unnecessary.

**B. Supplementing the Administrative Record**

██ Midwater goes on to argue that the district court improperly permitted the Fisheries Service to supplement the record with additional documents and declarations in support of the sliding scale methodology. As discussed below, we conclude that the district court did not abuse its discretion.

 We have permitted an agency to supplement an inadequate administrative record where it has found that the existing record is insufficient to explain the agency's decision. Indeed, judicial review of an agency decision may "be expanded beyond the [administrative] record if necessary to explain agency decisions." *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996) (citing *Animal Def. Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988)); *see also Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("If ... there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was ... to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."). Supplementation is permitted "(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter." *Southwest Ctr.,* 100 F.3d at 1450 (internal quotations omitted).

The district court here permitted supplementation so that it could determine whether the Fisheries Service provided sufficient explanation for its adoption of the sliding scale methodology. As the district court explained in granting the motion to supplement the record, "[the Fisheries Service] ha[d] already supplied 'further justification for the current allocation' without formal remand from this [c]ourt and has stated that it has no other information with which to supplement the record." Thus, the district court concluded that permitting the Fisheries Service to supplement the record in lieu of remand was "the most reasonable and efficient use of resources."

As discussed above, the supplemental declarations permitted the Fisheries Service to further explain how its current allocation conformed to the requirements of the Magnuson–Stevens Act and the Treaty of Neah Bay. Specifically, the supplemental declarations explained the failings of the biomass method, particularly its inability to account for the migratory patterns of Pacific whiting, its lack of biological theory for its application, and the likelihood that its use would result in undercounting Pacific whiting present in the Makah Tribe's usual and accustomed fishing areas. Supplementation also permitted explanation for the Fisheries Service's conclusion that the bulk of the Pacific whiting migrations take place primarily through the Makah Tribe's fishing grounds.

■ In sum, the Fisheries Service's supplement to the record permitted it to more fully explain both its rejection of the biomass methodology and its adoption of the sliding scale methodology. Because supplementation is permitted "if necessary to determine whether the agency has considered all relevant factors and has explained its decision," *id.*, we conclude that the district court did not abuse its discretion by permitting the Fisheries Service to supplement the record.

## CONCLUSION

Accordingly, the district court's grant of summary judgment to Appellees is **AFFIRMED**.